**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1640**

DENC, LLC,

>    Plaintiff − Appellee,

>    v.

PHILADELPHIA INDEMNITY INSURANCE COMPANY,

>    Defendant – Appellant,

>    and

TOKIO MARINE NORTH AMERICA, INC., d/b/a Philadelphia Insurance Companies, Inc.,

>    Defendant.

**No. 20-1644**

DENC, LLC,

>    Plaintiff − Appellant,

>    v.

PHILADELPHIA INDEMNITY INSURANCE COMPANY,

>    Defendant – Appellee,

>    and

TOKIO MARINE NORTH AMERICA, INC., d/b/a Philadelphia Insurance Companies, Inc.,

       Defendant.

_____

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  Catherine C. Eagles, District Judge.  (1:18−cv−00754−CCE−LPA)

_____

Argued:  October 27, 2021                          Decided:  April 18, 2022

_____

Before DIAZ and RUSHING, Circuit Judges, and FLOYD, Senior Circuit Judge.

_____

Affirmed in part, reversed in part, and remanded with instructions by published opinion. Judge Diaz wrote the opinion, in which Senior Judge Floyd joined, and in which Judge Rushing joined in part.  Judge Rushing wrote an opinion dissenting in part.

_____

**ARGUED:** David L. Brown, GOLDBERG SEGALLA LLP, Greensboro, North Carolina, for Appellant/Cross-Appellee.  Gregg E. McDougal, MCDOUGAL WORRELL LLP, Raleigh, North Carolina, for Appellee/Cross-Appellant. **ON BRIEF:** David G. Harris II, GOLDBERG SEGALLA LLP, Greensboro, North Carolina, for Appellant/Cross-Appellee.  John E. Branch III, Andrew D. Brown, SHANAHAN LAW GROUP, PLLC, Raleigh, North Carolina; Lawrence R. Duke, MCDOUGAL WORRELL LLP, Raleigh, North Carolina, for Appellee/Cross-Appellant.

_____

2

DIAZ, Circuit Judge:

Philadelphia Indemnity Insurance Company declined to cover a claim for collapse damage under a policy issued to DENC, LLC. DENC sued, alleging contract claims and violations of North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"). On summary judgment, the district court found that Philadelphia improperly denied coverage and failed to reasonably explain its basis for the denial. It thus held that Philadelphia breached the policy and violated the UDTPA, granting partial summary judgment to DENC. The court awarded contract damages, but it denied treble damages because DENC didn't show that Philadelphia's UDTPA violation proximately caused any injury. Instead, it awarded DENC nominal damages and attorneys' fees for that claim.

Philadelphia now appeals the district court's adverse rulings. DENC cross-appeals, arguing the court should have trebled its contract damages. Finding no error on liability, we affirm the district court's grant of partial summary judgment to DENC. We likewise discern no abuse of discretion in the court's award of attorneys' fees. But on damages, we find the court erred in assessing proximate cause under the UDTPA. We reverse the court's judgment in that regard and remand with instructions to treble DENC's contract damages.

I.

A.

DENC has owned The Crest, an apartment building in Elon, North Carolina, since 2013. It leased The Crest to Elon University for student housing. From November 2017 to November 2018, DENC insured the property with a policy from Philadelphia.

3

The policy covered "direct physical loss" to The Crest, so long as the loss occurred during the coverage period and wasn't expressly excluded or limited. J.A. 269, 291, 293. It specifically barred coverage for loss caused by decay, deterioration, or defective construction. Under one endorsement, the policy also excluded loss caused by "continuous or repeated seepage or leakage of water . . . that occurs over a period of 14 days or more." J.A. 349.

Of importance, the policy contained a "Collapse Endorsement" that modified the scope of coverage for "collapse" in the body of the policy. J.A. 362–64. The Collapse Endorsement comprised two parts.

Section I of the endorsement modified the policy's exclusions, deleting and replacing the subsection for "collapse." Under Section I, the policy excluded:

> Collapse, including any of the following conditions of property or any part of the property:
>
> (1) An abrupt falling down or caving in;
>
> (2) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or
>
> (3) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to (1) or (2) above.

J.A. 362. But this exclusion wouldn't apply to collapse caused by "[w]eight of people or personal property" or to collapse covered in Section II. *Id.*

Section II modified the policy to expressly cover "abrupt collapse," which it defined as "an abrupt falling down or caving in of a 'building' or any part of a 'building' with the

4

result that the 'building' or part of the 'building' cannot be occupied for its intended purpose." *Id.* Still, Section II only covered "abrupt collapse" caused by:

> a. "Building" decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;
>
>  . . .
>
> d. Use of defective material or methods in construction . . . if the abrupt collapse occurs after the construction . . . is complete, but only if the collapse is caused in part by . . . [w]eight of people or personal property.

J.A. 363. And Section II explained that its coverage wouldn't apply to:

> a. A "building" or any part of a "building" that is in danger of falling down or caving in;
>
> b. A part of a "building" that is standing, even if it has separated from another part of the "building"; or
>
> c. A "building" that is standing or any part of a "building" that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

*Id.*

The policy also covered DENC's "necessary expenses . . . incur[red] during the 'period of restoration' that [it] would not have incurred" had there been no covered loss. J.A. 320. The relevant section provided:

> (1) [Philadelphia] will pay any Extra Expenses to avoid or minimize the suspension of business and to continue "operations":
>
>> (a) At the described premises; or
>>
>> (b) At replacement premises or at temporary locations, including:
>>
>>> (i) Relocation expenses; and

5

(ii) Costs to equip and operate the replacement or temporary locations.

(2) [Philadelphia] will pay any Extra Expenses to minimize the suspension of business if [DENC] cannot continue "operations."

*Id.* The policy defined "operations" in relevant part as "[b]usiness activities [DENC] perform[s] at the described premises." J.A. 330.

## B.

In January 2018, students gathered on a second-floor breezeway of The Crest for a party. In the early hours of that night, partygoers began "jumping in the breezeway." J.A. 509. According to a witness, the breezeway "abruptly collapsed" while the students were jumping. *Id.* Two student reporters arrived in the morning. Both observed that the breezeway was hanging down by more than a foot. J.A. 509, 511.

DENC filed a claim with Philadelphia the next day. In response, Philadelphia engaged an adjuster to inspect the breezeway. By that time, the city had condemned The Crest. The adjuster said that undiscovered "water damage [which] occur[ed] over an extended period of time" caused the loss. J.A. 392.

Philadelphia then sent DENC two letters. The first was a reservation-of-rights letter, explaining that it would keep investigating DENC's claim. The second letter (sent two days later) informed DENC that it had "issued, or will be issuing payment . . . for damages or injuries sustained" under DENC's claim. J.A. 530. The letter also stated that "it appear[ed] another party[] may have caused or contributed to the damages sustained." *Id.* And while it said that Philadelphia would seek reimbursement from the "responsible party," the letter didn't specify who that party was. *Id.*

6

Philadelphia hired a structural engineer to assess the breezeway. He concluded that "long-term water intrusion [] ultimately resulted in the wood framing (structural) member's inability to support the dead (slab) and live (occupant) loads." J.A. 430. He suggested that the original building contractor failed to "properly install a water management system on the walls" or a "properly integrated waterproof system." *Id.* These failures, the engineer said, resulted in "long-term repeated moisture exposure" to the breezeway's wood framing. *Id.*

After reviewing the engineer's report, Philadelphia sent DENC a third letter. This time, Philadelphia said that it would deny coverage. The letter recited many of the adjuster's and engineer's findings on water-related damage. It also listed several policy provisions that ostensibly applied to DENC's claim, though some had been deleted or modified by endorsement.

Philadelphia explained that it was denying coverage "because the damage [was] reportedly the result of long-term water intrusion and deteriorated wood framing." J.A. 442. It connected this water damage to "the failure to properly install a water management system on the walls and a properly integrated waterproof system for the walkway slab and framing configuration as well as improper venting of the dryers." *Id.* Philadelphia also said the damage hadn't commenced during the policy's coverage period. The letter never referenced Philadelphia's earlier decision to pay the claim.

DENC responded that the policy covered the collapse, refuting Philadelphia's rationale for denying coverage. When Philadelphia failed to pay the claim, DENC sued.

7

C.

DENC filed a declaratory judgment action in North Carolina state court, also asserting claims for breach of contract, breach of the covenant of good faith and fair dealing, bad-faith denial and handling of its claim, and UDTPA violations.  Philadelphia removed the case to the Middle District of North Carolina.  The parties cross-moved for summary judgment, which the district court addressed in a series of orders.

The district court first resolved DENC's request for declaratory judgment and the breach-of-contract claim, granting summary judgment to DENC.  The court explained that the Philadelphia policy was an "all-risk" policy, which meant "it cover[ed] risks unless they [were] expressly excluded or limited by the policy itself."  *DENC, LLC v. Phila. Indem. Ins. Co.*, 421 F. Supp. 3d 224, 226–27 (M.D.N.C. 2019) ("*DENC I*").

The district court found that the policy covered the breezeway's collapse under (1) the Collapse Endorsement's "weight of people" exception to the exclusion of collapse coverage; and (2) the Collapse Endorsement's express coverage of "abrupt collapse" caused by hidden building decay or defective construction methods.  This finding shifted the burden to Philadelphia to show that an exclusion barred coverage.  Philadelphia pointed to the Collapse Endorsement's exclusions for buildings "in danger of falling down" and those that remain "standing."  *Id.* at 234–35.  The court determined neither applied.

The district court later ruled on the remaining claims.  *DENC, LLC v. Phila. Indem. Ins. Co.*, 426 F. Supp. 3d 151, 154 (M.D.N.C. 2019) ("*DENC II*").  It granted summary judgment to DENC on one of its four UDTPA claims.  The court found that Philadelphia's denial-of-coverage letter failed to reasonably explain the denial's "basis in the insurance

8

policy in relation to the facts," violating N.C. Gen. Stat. § 58-63-15(11)(n) and the UDTPA.[1] *Id.* at 155–57.

But the district court granted summary judgment to Philadelphia on the other UDTPA claims, as well as DENC's bad-faith claim. And though the court denied Philadelphia summary judgment on the claim alleging breach of the covenant of good faith and fair dealing, DENC later voluntarily dismissed that claim.

The district court then held a hearing on damages. DENC raised two contentions: (1) the policy covered DENC's temporary student-housing expenses; and (2) its contract damages should be trebled under the UDTPA.

The district court agreed with DENC on the former point but not the latter. It determined that DENC's temporary student-housing expenses were "necessary" and thus covered by the policy. But on the treble damages request, the court found that DENC had failed to show that Philadelphia's UDTPA violation proximately caused its contract damages. This ruling left DENC with nominal damages on its UDTPA claim but allowed it to seek statutory attorneys' fees. The parties stipulated to $400,007.79 in contract damages, leaving only the question of fees.

On DENC's motion, the district court granted a $221,455.49 fee award. It found that Philadelphia had willfully violated the UDTPA and, without good cause, refused to settle. *See DENC, LLC v. Phila. Indem. Ins. Co.*, 454 F. Supp. 3d 552, 569 (M.D.N.C.

---

[1] "Any violation of section 58-63-15 constitutes a violation of [the UDTPA]." *Cobb v. Penn. Life Ins. Co.*, 715 S.E.2d 541, 550 (N.C. Ct. App. 2011).

2020) ("*DENC III*").  The court based its award on Philadelphia's deceptive denial letter and its failure to make a reasonable settlement offer that accounted for the strength of DENC's claims until after DENC prevailed on the merits.

This appeal followed.

## II.

We begin with the parties' appeals of the district court's summary judgment rulings on DENC's contract and UDTPA claims.  We review a grant of summary judgment de novo, applying the same standards as the district court.  *Calloway v. Lokey*, 948 F.3d 194, 201 (4th Cir. 2020).

## A.

For breach of contract, Philadelphia advances three challenges to the district court's judgment on liability.  Philadelphia first argues that its policy excluded DENC's loss.  Next, it asserts that the loss "commenced" before the policy's coverage period.  Last, Philadelphia contends that, even if the court properly found coverage, it erred in finding that the policy also covered DENC's temporary housing expenses.

Like the district court, we apply North Carolina law.  An insurance policy "is a contract between the parties" and "must be construed so as to carry out their intent." *Allstate Ins. Co. v. Shelby Mut. Ins. Co.*, 152 S.E.2d 436, 440 (N.C. 1967).  But it's "well settled in North Carolina that insurance policies are construed strictly against insurance companies and in favor of the insured." *State Cap. Ins. Co. v. Nationwide Mut. Ins. Co.*, 350 S.E.2d 66, 73 (N.C. 1986).  Because coverage exclusions are disfavored, courts also

10

"strictly construe[]" ambiguities in a policy against the insurer. *Id.* And when "the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations," we resolve any doubt in favor of coverage. *Gaston Cnty. Dyeing Mach. Co. v. Northfield Ins. Co.*, 524 S.E.2d 558, 563 (N.C. 2000) (cleaned up).

With these principles in mind, we address Philadelphia's contentions. Finding each lack merit, we affirm Philadelphia's liability for breach of contract.

1.

Philadelphia challenges the district court's finding that Sections I and II of the policy's Collapse Endorsement covered DENC's claim. Because we affirm the district court's finding under Section II, we won't discuss Philadelphia's arguments on Section I.

The district court read Section II to cover "abrupt collapse" damage where there was "an abrupt falling down with the result that the building could not be occupied, and the collapse was caused by either building decay or defective methods in construction plus the weight of people." *DENC I*, 421 F. Supp. 3d at 233 (cleaned up). It then found that the undisputed evidence showed the breezeway's sudden, one-foot collapse met these criteria. This finding shifted the burden to Philadelphia to show that an exclusion barred coverage.

The district court determined Philadelphia hadn't carried its burden. It rejected Philadelphia's reliance on Section II's exclusion of coverage for structures "in danger of falling down" or those that remain "standing." It said the breezeway had fallen; there was no "danger" of that. And the breezeway's one-foot drop meant it wasn't "structurally functional." *Id.* at 235. So even if the rest of The Crest's architecture remained sound, the breezeway wasn't "standing." *Id.*

11

Philadelphia objects to the district court's reasoning on two fronts. First, it argues that the court erred in finding that DENC's loss resulted from the breezeway's "abrupt collapse." Second, it claims that the breezeway remained standing, over the court's holding to the contrary. We disagree on both points.

Philadelphia contends the district court's "abrupt collapse" ruling conflicts with case law and the record evidence. Not so.

For one, the cases Philadelphia relies on are of no moment. *See Mt. Zion Baptist Church of Marietta v. GuideOne Elite Ins. Co.*, 808 F. Supp. 2d 1322 (N.D. Ga. 2011); *Hunter v. State Farm Fire & Cas. Co.*, No. 17-cv-00224, 2019 WL 937338 (W.D.N.C. Feb. 26, 2019). True, those courts rejected collapse coverage on policies requiring an abrupt falling. But both cases dealt with collapse damage that occurred over many years. *See Mt. Zion*, 808 F. Supp. 2d at 1323 (damage occurred over fifteen years); *Hunter*, 2019 WL 937338, at *4 (damage occurred "[o]ver the course of several years"). Here, there's no dispute that the breezeway's one-foot drop occurred "suddenly and without warning" (i.e., abruptly). *DENC I*, 421 F. Supp. 3d at 233.

Nor are we persuaded the evidence contradicts the district court's finding that the breezeway's "abrupt collapse" caused DENC's loss. Philadelphia points to the parties' engineers, both of whom testified that water damage deteriorated the wooden framework of the breezeway. Philadelphia posits that this water damage caused DENC's loss, not an "abrupt collapse."

As the district court aptly put it, Philadelphia's "framing ignores the Collapse Endorsement's focus on whether the event was a collapse." *Id.* The engineers' testimony

12

explains what (in their view) caused the collapse. But it sidesteps the relevant question of whether the breezeway abruptly collapsed. On that point, Philadelphia is silent—with good reason. The undisputed evidence shows the breezeway fell suddenly by at least a foot. With no definition of "abrupt collapse" in the policy that excludes these circumstances, we find that requirement satisfied. *See State Cap. Ins. Co.*, 350 S.E.2d at 73 ("[I]nsurance policies are construed strictly against insurance companies.").

As for the district court's rejection of the collapse exclusions, Philadelphia asserts that the breezeway was still "standing." Philadelphia claims the court's conclusion to the contrary doesn't "match the evidence in this case" because the parties' engineers testified that the breezeway was sagging and cracking but still supported. Appellant's Br. at 33. Its position rests on the premise that "coverage is only afforded where the building falls to the ground." Appellant's Br. at 36 (cleaned up).

We think this position reads the exclusion too broadly.[2] *See State Cap. Ins. Co.*, 350 S.E.2d at 71 (instructing we interpret exclusionary clauses narrowly). The policy doesn't define "standing," so we give it a "meaning consistent with the sense in which [it's] used in ordinary speech." *Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, LLC*, 692 S.E.2d 605, 612 (N.C. 2010) (cleaned up). Even in ordinary speech, "standing" is subject to several interpretations—including "erect" and "remaining at the same level or amount for an indefinite period." *Standing*, THE MERRIAM-WEBSTER DICTIONARY (7th ed. 2016).

---

[2] Philadelphia's representative agreed as much. *See* J.A. 591.

13

The unchallenged evidence at summary judgment included witness accounts that the breezeway "had fallen at least one foot, with significant debris and a part of the breezeway on the ground." *DENC I*, 421 F. Supp. 3d at 231. Giving DENC the benefit of any reasonable interpretation, we find that the breezeway's one-foot drop renders that part of the building no longer "standing."

We thus affirm the district court's interpretation of Section II of the Collapse Endorsement.

2.

Philadelphia next claims that the district court erred by finding that DENC's loss began during the policy's coverage period. The court recognized that the policy only covered losses that "commenced" between November 2017 and November 2018. And because "the collapse occurred and the loss commenced" in January 2018, the court found that requirement met. *DENC I*, 421 F. Supp. 3d at 236. Philadelphia resists this conclusion, suggesting that DENC's loss "commenced" when "water intrusion first began to damage" the breezeway's wooden framework "as a result of faulty construction and water intrusion" in 2004. Appellant's Br. at 38.

We reject Philadelphia's contention for two reasons. First, it again mistakenly frames DENC's loss as water damage caused by faulty construction, rather than the breezeway's sudden collapse. Second, accepting Philadelphia's position would render policy terms meaningless. *See Nelson v. Rhem*, 102 S.E. 395, 396 (N.C. 1920) ("[W]e [can't] assume that the parties have inserted meaningless terms in their agreement.").

14

For example, the Collapse Endorsement covered abrupt collapse caused by defective construction if the collapse occurred after construction and was caused in part by the weight of people. But the policy issued over a decade after The Crest's construction. So if we were to read the defective construction as "commencing" the loss, this cause of collapse would never be within the policy's coverage period. We decline to characterize the loss in a way that precludes an entire category of coverage.

3.

Last, Philadelphia claims that, even if we find that the policy covered the collapse, it still doesn't cover DENC's temporary housing expenses for relocating students while it repaired the breezeway. Again, we disagree.

The district court determined that the "Extra Expenses" provision in the policy covered DENC's temporary housing expenses. Under this provision, Philadelphia agreed to pay "Extra Expenses" DENC incurred to "avoid or minimize the suspension of business and to continue 'operations.'" J.A. 320. The policy defined "Extra Expenses" as "necessary expenses" during a period of repair that DENC "would not have incurred" had there been no covered loss. *Id.* Because the city condemned The Crest after the breezeway's collapse, DENC claimed that the cost of relocating its tenants to similar housing while repairing The Crest was a necessary expense.

Philadelphia's challenges to the district court's decision aren't persuasive. It first argues that DENC's expenses didn't stem from the breezeway's collapse but The Crest's condemnation. And it submits the decade-long deterioration of the breezeway's wood framing caused the condemnation. According to Philadelphia's engineer, the city would

15

have condemned The Crest before the collapse if any inspector had observed the wood framing's decay.

Maybe so, but that's not what happened. The city inspected and condemned The Crest as a direct result of the breezeway's collapse. The causes of that collapse are links in the same chain of events.

Philadelphia next contends that DENC's temporary housing expenses weren't "necessary" to "avoid or minimize" the suspension of its business. Instead, Philadelphia argues DENC incurred those expenses gratuitously because the lease "between DENC and Elon University contains no requirement that DENC provide alternative housing arrangements" upon a loss. Appellant's Br. at 43.

We decline to read "necessary" expenses to mean "contractually obligated" expenses. The parties agree that the policy doesn't define "necessary," so we construe it according to its ordinary meaning. *See Harleysville Mut. Ins. Co.*, 692 S.E.2d at 612. While it's true (as Philadelphia suggests) that "necessary" can mean "inevitable" or "compulsory," it can also mean "positively needed." *Necessary*, THE MERRIAM-WEBSTER DICTIONARY (7th ed. 2016).

It's reasonable to interpret the "Extra Expenses" provision as covering DENC's temporary student-housing expenses. DENC's sole business at The Crest was to provide adequate student housing. Facing condemnation, DENC chose to temporarily house students elsewhere. Doing so was "positively needed" to "avoid or minimize" the suspension of DENC's business. After all, DENC's representative testified that the university withheld rent until DENC relocated its students. And DENC could have lost its

16

business relationship with Elon had it not relocated the students. Philadelphia's reading of "necessary" would have DENC suffer the suspension of its business before taking steps to "avoid or minimize" that result—so we reject it.

With this understanding of "necessary," the policy covers these expenses. The "Extra Expenses" provision expressly includes those incurred to continue operations at "temporary locations," such as "[r]elocation expenses" and the "[c]osts to equip and operate the . . . temporary locations." J.A. 320. That's what happened here.[3]

*     *     *

In sum, we affirm the district court's holding on Philadelphia's liability for DENC's losses under the policy for the breezeway's collapse.

## B.

We turn next to the district court's rulings on DENC's claim under North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75.1-1. Philadelphia claims the court erred in finding that it violated the UDTPA. DENC contends that the court erroneously denied it treble damages.

---

[3] We reject Philadelphia's contention that DENC's claim for temporary housing expenses is a "double-dipping" of damages for lost rents. After The Crest's condemnation, Elon withheld rent for about a month until DENC relocated the students to similar housing. DENC later sought that amount as lost business income under the policy. On the other hand, DENC's claim for temporary housing expenses covered the costs of lodging the students until The Crest could reopen. DENC wouldn't have incurred either loss but for the breezeway's collapse. So payment of the entire claim restores DENC to the position it would have been in without the collapse.

17

We agree with the district court that Philadelphia violated the UDTPA but reach a different conclusion on damages.

1.

We first address the district court's finding of a UDTPA violation.  DENC's UDTPA claim turned on a predicate violation of North Carolina's "Unfair Claim Settlement Practices" statute, N.C. Gen. Stat. § 58-63-15(11), which "defines unfair practices in the settlement of insurance claims."  *Elliot v. Am. States Ins. Co.*, 883 F.3d 384, 396 (4th Cir. 2018).  "Conduct that violates § 58-63-15(11) constitutes a violation of [the UDTPA] as a matter of law."  *Id.* (cleaned up).  Whether an insurer's conduct reflects an unfair or deceptive practice is a question of law.  *Gray v. N.C. Ins. Underwriting Ass'n*, 529 S.E.2d 676, 681 (N.C. 2000).

Here, the district court determined that Philadelphia violated § 58-63-15(11)(n) by first granting coverage and then denying it in a confusing letter.  Section 58-63-15(11)(n) requires insurers to "promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts . . . for denial of a claim."  Taking the evidence in the light most favorable to Philadelphia, we agree with the district court's ruling.[4]

---

[4] We've noted an open question on "whether conduct that violates § 58-63-15(11) is a per se violation of [the UDTPA], or instead whether that conduct satisfies [only the UDTPA's] conduct requirement of an unfair or deceptive act or practice."  *Elliot*, 883 F.3d at 396 n.7.  The latter interpretation would require a plaintiff to satisfy the remaining elements of a UDTPA claim.  We don't reach this question because Philadelphia hasn't challenged the district court's findings that DENC met those remaining elements.

18

Consider the facts leading to Philadelphia's denial of coverage. Shortly after the breezeway's collapse, Philadelphia advised DENC that it would be investigating the claim under a reservation of rights. Two days later, Philadelphia stated that it had "issued, or [would] be issuing payment" to DENC. J.A. 530. Yet a few weeks after that, Philadelphia denied DENC's claim in a letter that failed to reference its earlier agreement to pay.

And as the district court determined, "[n]othing in the denial letter links 'the basis in the insurance policy' for the denial 'to the facts,' as required by § 58-63-15(11)(n)." *DENC II*, 426 F. Supp. 3d at 156. The letter relayed Philadelphia's water-damage findings and then, in rote fashion, recited purported policy terms. It denied coverage because DENC's damage was "the result of long-term water intrusion and deteriorated wood framing." J.A. 442.

But none of the policy provisions Philadelphia listed in the denial letter used the phrase "water intrusion." Nor did the letter explain which of the many enumerated provisions barred coverage. This is particularly troubling because "some of the provisions set forth in the letter were not even part of the policy; several had been deleted and superseded by policy amendments or endorsements. Others patently [didn't] apply to the breezeway collapse at issue, such as those citing flood or steam boilers." *DENC II*, 426 F. Supp. 3d at 156. Philadelphia even included "the wrong provision governing collapse." *Id.* The drafters of the denial letter conceded these errors.

The district court was right to find that Philadelphia offered no "reasonable explanation" for denying coverage, which § 58-63-15(11)(n) requires. Even though the letter said that no "covered collapse commenced" during the coverage period, J.A. 444, it

19

didn't explain (much less reasonably so) why the policy's operative Collapse Endorsement didn't cover the loss. Instead, it left DENC to decipher a morass of largely inapplicable policy language with no clear connection to Philadelphia's factual investigation.

Our dissenting colleague would find that Philadelphia's decision to deny coverage due to water intrusion and the breezeway's deteriorated wood framing sufficiently "link[ed] the facts to the quoted exclusions." Dissenting Op. at 32. But the "explanation" that our colleague quotes is a two-sentence summary of the facts that Philadelphia recited in greater detail earlier in the letter to support its denial of coverage. *Compare* J.A. 438–39 (listing, among other things, observation of "[l]ong-term water intrusion and significant deterioration of the wood framing"), *with* J.A. 442 ("We respectfully must deny coverage because the damage is reportedly the result of long-term water intrusion and deteriorated wood framing.").

In our view, restating the facts gets Philadelphia no closer to explaining the interaction of those facts with the policy. And § 58-63-15(11)(n) requires that insurers do more than list all potentially applicable policy terms alongside the facts. Indeed, an insurer must reasonably explain the denial's "basis in the insurance policy *in relation to* the facts." N.C. Gen. Stat. § 58-63-15(11)(n) (emphasis added); *Relation*, WEBSTER'S THIRD NEW INT'L DICTIONARY (1976) ("Reference, respect"). We agree that insurers need not write "a sophisticated legal memorandum." Dissenting Op. at 30. But Philadelphia made no attempt to bridge the gap between policy and fact.

Rejecting that conclusion, the dissent says Philadelphia "clearly fault[ed] defective construction and design . . . for long-term water seepage and decay," Dissenting Op. at 33,

20

which are specifically denominated exclusions under the policy. With the benefit of full briefing and argument, our friend in dissent may be able to connect "long-term water intrusion" and the breezeway's defective construction with earlier quoted exclusions in the denial letter. But Philadelphia had the duty to reasonably spell out that connection in the first instance. Instead, it tried to hide the ball by requiring DENC to sift through many other unexplained (and irrelevant) policy provisions, which were *not* the basis for the denial. After inundating DENC with admittedly inapt policy terms, Philadelphia failed to identify which exclusion was at play. Permitting that obfuscation asks too much of the insured and too little of the insurer.[5]

For its part, Philadelphia contends that it didn't misrepresent the policy. Rather, Philadelphia says, it was neither improper nor deceptive for it to reserve its right to claim any "potentially applicable" exclusions and to "provide context" for other listed policy terms. Appellant's Br. at 49. But Philadelphia's employees admitted that certain listed provisions had nothing to do with DENC's claim. *See* J.A. 477, 486, 541–42, 549–50. So the cited exclusions weren't "potentially applicable."

More to the point, DENC didn't have to show "actual deception," only that Philadelphia's denial letter had the "capacity to mislead." *Chastain v. Wall*, 337 S.E.2d

---

[5] According to the dissent, the letter's statements that (1) the policy's water-damage coverage was inapplicable; and (2) "some" damage occurred before the policy's coverage period, J.A. 442, are more proof that Philadelphia satisfied the requirements of § 58-63-15(11)(n). But a single conclusory sentence that the policy's water-damage coverage doesn't apply is no explanation. And having conceded that some loss occurred during the coverage period, Philadelphia failed miserably to explain why it had no duty to cover the loss.

21

150, 153–54 (N.C. 1985).  The denial letter and its context had that capacity.  DENC might have believed that the inapplicable policy provisions in the denial letter barred coverage when left to connect the dots between Philadelphia's investigation and the policy language.

In short, we affirm the district court's finding that Philadelphia's conduct violated § 58-63-15(11)(n)—and thus the UDTPA—by failing to reasonably explain "the basis in the insurance policy in relation to the facts" for its denial.

## 2.

We now address DENC's cross-appeal, which challenges the district court's refusal to treble DENC's contract damages under the UDTPA because Philadelphia's deceptive practice didn't proximately cause those damages.  Here, the district court erred.

Under N.C. Gen. Stat. § 75-16, courts must treble damages if a defendant violates the UDTPA.  In *Gray v. North Carolina Insurance Underwriting Ass'n*, the Supreme Court of North Carolina explained that a trebled award is limited to "damages *proximately caused* by a [UDTPA] violation," not "damages on every claim that happens to arise in a case involving a [UDTPA] violation."  529 S.E.2d at 684–85.  "To recover treble damages, a plaintiff must show that he suffered actual injury as a proximate result of [a] defendant's deceptive statement or misrepresentation."  *Id.* at 685 (cleaned up).

Since *Gray*, courts have trebled contract damages when a UDTPA claim arises from a breach of contract plus aggravating factors.  *See Colonial Trading, LLC v. Bassett Furniture Indus., Inc.*, 530 F. App'x 218, 227 (4th Cir. 2013).  Put another way, when the "same course of conduct" supports both breach of contract and a UDTPA violation, a plaintiff has a right to treble damages.  *See Garlock v. Henson*, 435 S.E.2d 114, 116 (N.C.

22

Ct. App. 1993). This remedy prevents defendants from "divid[ing] the breach of contract action and the conduct which aggravated the breach when in substance there is but one continuous transaction amounting to unfair and deceptive trade practices." *Johnson v. Colonial Life & Accident Ins. Co.*, 618 S.E.2d 867, 872 (N.C. Ct. App. 2005), *disc. rev. denied*, 627 S.E.2d 620 (N.C. 2006).

While the district court never addressed whether Philadelphia's denial letter constituted a substantial aggravating circumstance accompanying its breach of contract, we conclude it was. The district court rightly determined the letter was deceptive. *See Bartolomeo v. S.B. Thomas, Inc.*, 889 F.2d 530, 535 (4th Cir. 1989) (suggesting plaintiffs must "demonstrate deception" to show an aggravated contract breach that violates the UDTPA). And we find that Philadelphia's deceptive letter and related conduct—which violated § 58-63-15(11)(n)—can't be divorced from its breach. The letter was Philadelphia's sole communication denying coverage before DENC sued, despite DENC's attempt at informal resolution. The letter *was* the denial, and so it *was* the breach.

The district court's decision to apply a separate proximate-cause analysis to the contract and UDTPA damages makes too fine a distinction between Philadelphia's unlawful acts "when in substance there is but one continuous transaction." *Johnson*, 618 S.E.2d at 872; *cf. Cullen v. Valley Forge Life Ins. Co.*, 589 S.E.2d 423, 431 (N.C. Ct. App. 2003) (finding a deceptive denial-of-coverage letter was "the same injury forming the basis" of the plaintiff's contract and UDTPA claims), *overruled on other grounds by Bumpers v. Cmty. Bank of N. Va.*, 747 S.E.2d 220 (N.C. 2013).

23

Despite Philadelphia's insistence, *Gray* is not to the contrary. There, the Supreme Court of North Carolina agreed with the trial court's decision to treble only damages that the jury found were caused by a UDTPA violation—but not the jury's award of contract damages. *See* 529 S.E.2d at 685. The *Gray* jury made no specific findings that the conduct supporting the UDTPA violation attended the breach of contract.[6] *See id.* Without such findings, the trial court couldn't conclude that the "mere breach of contract" itself was enough to maintain a UDTPA violation, so it couldn't treble the contract damages. *Id.*

Unlike *Gray*, the evidence here reflects that Philadelphia's UDTPA violation was aggravating conduct accompanying its contract breach. *Cf. Colonial Trading, LLC*, 530 F. App'x at 228 (declining to treble contract damages because the jury had only awarded damages on UDTPA claims for bribery and coercion, "not the contract-related acts").[7] So we reverse the district court and find DENC has proven that Philadelphia's UDTPA violation proximately caused its damages.

---

[6] The verdict form asked whether the defendant engaged in any of five deceptive acts without directing the jury to specify which act. *Gray*, 529 S.E.2d at 683–84. And some acts listed were not contract-related. *See id.*

[7] Philadelphia's reliance on *Nelson v. Hartford Underwriters Insurance Co.* is inapt, as the case doesn't address whether contract damages should be trebled on successful and overlapping contract and UDTPA claims. *See* 630 S.E.2d 221, 229–34 (N.C. Ct. App. 2006).

24

* * *

To recap, we affirm the district court's grant of summary judgment to DENC on its UDTPA claim but reverse its holding on damages. On remand, we instruct the district court to enter judgment in DENC's favor for treble contract damages.

III.

Finally, we turn to Philadelphia's challenge to the district court's fee award. In North Carolina, a court may "award attorneys' fees against the losing party in a suit alleging a violation of the UDTPA." *ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 472 F.3d 99, 127 (4th Cir. 2006) (citing N.C. Gen. Stat. § 75-16.1). To do so, a court must find (1) "willfulness on the part of the party committing the violation" and (2) that the party engaged in "an unwarranted refusal to resolve the matter which forms the basis of the suit."[8] *Id.* We review the district court's decision to award fees for abuse of discretion. *See id.* at 113.

Philadelphia contends the district court erred in determining that it both acted willfully and engaged in an unwarranted refusal to settle. Finding no abuse of discretion on either element, we affirm.

---

[8] N.C. Gen. Stat. § 75-16.1 also requires that a fee award be "reasonable," but Philadelphia hasn't contested the amount of the award.

25

A.

The district court found that Philadelphia's UDTPA violation was willful because it sent the denial letter "intentionally and not accidentally or by mistake." *DENC III*, 454 F. Supp. 3d at 564. Philadelphia doesn't challenge the court's findings that its employees (including a vice president) drafted and reviewed the letter before sending it to DENC. *Id.* Rather, Philadelphia contends the district court erred in finding willfulness because the letter merely evinced an "honest disagreement" with DENC on coverage. Without evidence that it engaged in "fraud, malice, [or] gross negligence," Philadelphia claims the court couldn't find it acted "intentionally with the view to doing injury to another," i.e., willfully. Appellant's Br. at 53–54 (citing *Standing v. Midgett*, 850 F. Supp. 396, 404 (E.D.N.C. 1993)). We disagree.

Conduct need not be "fraudulent, malicious, or grossly negligent to be willful" under the UDTPA. *DENC III*, 454 F. Supp. 3d at 565. It's enough that a party engaged in a deceptive trade practice intentionally, rather than by accident or mistake. *E.g.*, *United Laby's, Inc. v. Kuykendall*, 403 S.E.2d 104, 111 (N.C. Ct. App. 1991) (finding willfulness despite defendant's honest belief in deceptive practice); *see also In re Pierce*, 79 S.E. 507, 508 (N.C. 1913) ("Willful is used in contradistinction to accidental or unavoidably."). So the district court didn't abuse its discretion by finding Philadelphia "willfully" sent the deceptive letter.

B.

The district court also determined that Philadelphia engaged in an unwarranted refusal to settle until its first reasonable offer in December 2019, which followed the court's

26

summary judgment for DENC on its breach of contract and UDTPA claims.  *DENC III*, 454 F. Supp. 3d at 565–66.  Ample evidence supports the district court's conclusion.

The court first pointed to Philadelphia's refusal to seriously consider DENC's response to its deceptive denial letter.  *See id.* at 565.  Philadelphia never answered DENC's letter, even though DENC noted that Philadelphia hadn't considered the Collapse Endorsement.  Nor did Philadelphia ever "perform the analysis of its own policy of the kind it undertook in its summary judgment briefing."  *Id.*  The district court also found that Philadelphia never pursued the "obviously irrelevant" policy provisions listed in the denial letter, yet it refused to disavow the deceptive letter.  *Id.*; *see Pinehurst, Inc. v. O'Leary Bros. Realty, Inc.*, 338 S.E.2d 918, 926 (N.C. Ct. App. 1986) (affirming fee award where claim turned on a "deceptive letter which defendants never retracted and still contend was an acceptable business practice").

The court next compared the settlement negotiations to DENC's ultimate recovery.  *See United Laby's*, 403 S.E.2d at 111 (finding a defendant's attempt at settling "not realistic" in view of final jury award).  Philadelphia first offered $50,000 and then $212,500, which equaled only half the contract damages DENC sought.  *DENC III*, 454 F. Supp. 3d at 565.  And when the court granted summary judgment on DENC's contract claim, Philadelphia's next offer accounted only for DENC's contract damages, ignoring its UDTPA claim.

The district court found Philadelphia didn't make a reasonable settlement offer until December 2019, after the court granted summary judgment for DENC on its UDTPA claim.  That $525,000 offer was reasonable (said the court) because it accounted for

DENC's full contract damages and "the strength of DENC's argument on its successful [UDTPA] claim." *Id.* at 566.

Philadelphia's only retort is to shift the blame to DENC for its "steadfast refusal to negotiate below three times its contract damages." Appellant's Br. at 54. But "Philadelphia, not DENC, is the wrongdoer here." *DENC III*, 454 F. Supp. 3d at 566. DENC's unyielding negotiating position doesn't excuse Philadelphia's failure to make a reasonable settlement offer. Besides, the district court did consider DENC's obstinance. That's why it limited the fee award to attorneys' fees incurred up to Philadelphia's reasonable December 2019 offer, instead of through the fees motion, as DENC requested.

We see no reason to disturb the district court's sound exercise of its discretion.

IV.

For these reasons, the district court's judgment is

*AFFIRMED IN PART, REVERSED IN PART,*
*AND REMANDED WITH INSTRUCTIONS.*

28

RUSHING, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that Philadelphia's policy covers the collapse of the breezeway and, therefore, that the district court should be affirmed in its coverage determination. I disagree, however, that Philadelphia failed to promptly and reasonably explain its basis for denying coverage in violation of North Carolina's Unfair and Deceptive Trade Practices Act (UDTPA). Because I would reverse the district court's UDTPA ruling, I would find no basis for attorneys' fees or treble damages. I therefore join the majority's opinion as to Parts I and II-A but respectfully dissent as to Parts II-B and III.

North Carolina General Statute § 58-63-15(11) forbids certain unfair insurance claims-settlement practices, which also qualify as violations of UDTPA, N.C. Gen. Stat. § 75-1.1. *See Gray v. N.C. Ins. Underwriting Ass'n*, 529 S.E.2d 676, 683 (N.C. 2000); *see also Elliott v. Am. States Ins. Co.*, 883 F.3d 384, 396 (4th Cir. 2018). For example, subsection (11)(a) prohibits an insurer from "[m]isrepresenting pertinent facts or insurance policy provisions relating to coverages at issue." N.C. Gen. Stat. § 58-63-15(11)(a). Subsection (11)(d) prohibits an insurer from "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information." *Id.* § 58-63-15(11)(d). Subsection (11)(g) prohibits "[c]ompelling [the] insured to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insured." *Id.* § 58-63-15(11)(g). DENC initially brought claims under these subsections, but the district court granted summary judgment in favor of Philadelphia, and DENC does not challenge those rulings in its cross-appeal.

29

The only provision at issue on appeal is subsection (11)(n), which makes it unlawful for an insurer to "[f]ail[] to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement." *Id.* § 58-63-15(11)(n).

Subsection (11)(n) does not impose a high bar for insurers, requiring only a prompt and reasonable explanation, not a sophisticated legal memorandum. Courts in North Carolina have found denial letters sufficient when they simply identify a claimed policy exclusion or other ground for denial. *See*, *e.g.*, *Murphy-Brown, LLC v. ACE Am. Ins. Co.*, No. 19 CVS 2793, 2019 WL 6878942, at *8–9 (N.C. Super. Ct. Dec. 16, 2019) (pollution exclusions); *Lockhart v. State Farm Fire & Cas. Co.*, No. 1:17-cv-994, 2018 WL 3339531, at *3 (M.D.N.C. July 6, 2018) (insured's lack of cooperation); *Reliastar Life Ins. Co. v. Laschkewitsch*, No. 5:13-CV-210-BO, 2014 WL 2211033, at *11–12 (E.D.N.C. May 28, 2014) (insured's misrepresentations). By contrast, courts have found subsection (11)(n) implicated when the insurer fails to identify any basis whatsoever for denying an insured's claim. *See*, *e.g.*, *Guessford v. Pa. Nat'l Mut. Cas. Ins. Co.*, 983 F. Supp. 2d 652, 665–666 (M.D.N.C. 2013) (insurer "refused to provide Plaintiff with *any* explanation of the basis for its compromise settlement"); *Miller v. Nationwide Mut. Ins. Co.*, 435 S.E.2d 537, 543–544 (N.C. Ct. App. 1993) (insurer "failed to identify any policy provision" and cited no authority supporting its refusal to pay).

Disagreement about the validity of the insurer's claimed basis for denial is insufficient to sustain a subsection (11)(n) claim. *See*, *e.g.*, *Cent. Carolina Bank & Tr. Co. v. Sec. Life of Denver Ins. Co.*, 247 F. Supp. 2d 791, 804 (M.D.N.C. 2003); *Majstorovic v.*

*State Farm Fire & Cas. Co.*, No. 5:16-cv-771-D, 2018 WL 1473427, at \*7 (M.D.N.C. July 6, 2018); *Murphy-Brown, LLC*, 2019 WL 6878942, at \*9.  That is, an insurer satisfies subsection (11)(n) by reasonably explaining its basis for denial, even if the denial does not ultimately prevail.  It follows that an insurer does not violate subsection (11)(n) simply by failing to refute an insured's potential counterarguments in favor of coverage.

In my view, Philadelphia's eight-page denial letter, issued a few weeks after it received notice of DENC's claim, satisfied the insurer's obligation under subsection (11)(n) to provide a prompt and reasonable explanation of the basis for denial.  The letter begins by summarizing the factual findings by Philadelphia's investigators: the breezeway wall lacked a "properly integrated water management system," including a "weather resistant barrier"; "heavy water stains" and "significant biological growth" were found underneath the first floor breezeway's vinyl ceiling; water had been directed to the wood framing supporting the breezeway's concrete slab due to the absence of proper water sealing; dryer vents from laundry rooms were discharging "directly onto the framing configuration" instead of "venting to the exterior"; the breezeway's support structure revealed "[l]ong-term water intrusion and significant deterioration of the wood framing"; "[s]hrinkage cracking" had occurred "in the construction control joints and randomly within" the concrete slab; and the stairs leading to the breezeway were held together with "questionable connections," including nuts and washers that "exhibited significant corrosion."  J.A. 439.

The letter then identifies and quotes what appears to be every potentially applicable policy exclusion, including some exclusions that ultimately were not advanced in litigation.

31

It quotes an exclusion for loss caused by faulty design, construction, or maintenance. It quotes the exclusions for collapse, including the bar on coverage for a building that is still "standing" even if it is "cracking, bulging, sagging," "settling," or "in danger of falling down." J.A. 441–442. The letter quotes numerous exclusions related to water damage, including: (1) an exclusion for loss caused by "[r]ust, corrosion, fungus, [or] decay," "[s]ettling, cracking, shrinking or expansion," or "[d]ampness or dryness of atmosphere"; (2) an exclusion for loss to "[t]he interior of any 'buildings' . . . caused by or resulting from rain"; (3) a flood exclusion; (4) an exclusion for loss to steam boilers and pipes and water heating equipment; and (5) an exclusion for damage resulting from "continuous or repeated seepage or leakage of water, or the presence of condensation" that "occurs over a period of 14 days or more." J.A. 440–442. The letter also quotes the definition of "Specified Causes of Loss," which extends coverage to water damage that is "the direct result of the breaking or cracking of" a "system or appliance containing water or steam." J.A. 441.

Having recited these provisions, the letter then states the bases for the denial of coverage in plain language, linking the facts to the quoted exclusions. It says: "We respectfully must deny coverage because the damage is reportedly the result of long-term water intrusion and deteriorated wood framing," which was "the result of the failure to properly install a water management system on the walls and a properly integrated waterproof system for the walkway slab and framing configuration as well as improper venting of the dryers." J.A. 442. The letter further declines coverage because "the damage was not caused by any of the Specified Causes of Loss as defined under the policy." J.A. 442. "Lastly," the letter explains that coverage is denied because the damage began "prior

to the inception date of coverage," and it immediately quotes the policy's exclusion for "loss or damage commencing" outside the policy period. J.A. 442–443; *see* J.A. 444 (reiterating the coverage period explanation).

Under these circumstances, I cannot conclude that Philadelphia failed to provide a "reasonable explanation" for denying coverage in view of the facts and policy provisions. N.C. Gen. Stat. § 58-63-15(11)(n). The letter's explanation clearly faults defective construction and design of the water management system and dryer vents for long-term water seepage and decay, all of which are mentioned in the previously quoted policy exclusions. Although the majority complains that no exclusion uses the precise phrase "water intrusion," *see supra*, at 19, the quoted exclusions bar coverage for "continuous or repeated seepage or leakage of water" and for damage caused by "rain" and other water events, J.A. 441–442, making the letter's meaning apparent. The letter also specifically notes that the policy provision that *does* cover water damage—Specified Causes of Loss—does not apply. And it additionally denies coverage for the plainly stated reason that the loss began outside of the policy period, quoting from the policy itself. These are reasonable explanations for Philadelphia's denial of coverage, even though Philadelphia's reasons for the denial ultimately proved to be incorrect.

The majority and the district court fault Philadelphia for including policy exclusions for flooding and steam boilers and pipes, which were not implicated here. *See supra*, at 19. The author of the letter testified that he included these provisions because he was not sure if any of the water damage could be traced to these sources; in other words, he was (perhaps overzealously) covering all his bases. But inclusion of these ultimately

33

inapplicable provisions does not negate the letter's plain statement of the reasons for denial: defective construction and design causing long-term water seepage and decay; the absence of a Specified Cause of Loss; and loss beginning outside the policy period.  Even assuming that inclusion of inapplicable policy provisions could potentially so obscure an insurer's basis for denial that it amounts to "[f]ailing" to explain, N.C. Gen. Stat. § 58-63-15(11)(n), the denial letter here demonstrates this is not such a case.  And while the letter does not reference Philadelphia's earlier agreement to pay, not even the majority claims this constitutes a failure to reasonably explain the basis for the denial.

The majority and the district court also observe that some of the provisions quoted in the letter had been modified or superseded by amendments.  *See supra*, at 19.  Philadelphia should have done better.  Yet it does not appear that these corrections altered the bases Philadelphia identified for its denial.  And even if an insurer is wrong to deny coverage under certain provisions, that in itself is not a failure to *explain* the (erroneous) basis for denial.  Moreover, "[m]isrepresenting . . . insurance policy provisions" belongs to a different statutory provision—subsection (11)(a)—on which DENC lost below and which it has abandoned on appeal.  N.C. Gen. Stat. § 58-63-15(11)(a).  The district court granted summary judgment to Philadelphia on DENC's subsection (11)(a) claim because DENC did not show reliance on the alleged misrepresentations, which is a required element of a subsection (11)(a) claim.  *See DENC, LLC v. Phila. Indem. Ins. Co.*, 426 F. Supp. 3d 151, 157 (M.D.N.C. 2019) (citing *Bumpers v. Cmty. Bank of N. Va.*, 747 S.E.2d 220, 226 (N.C. 2013)).  I disagree that DENC's failed subsection (11)(a) claim nevertheless satisfies

34

subsection (11)(n).  Misrepresentation and failure to explain are fundamentally different errors, and subsection (11)(n) assigns liability only for the latter.

In sum, Philadelphia's denial letter was not a model of clarity.  Like most insurance policies themselves, it was dense, long, and poorly formatted.  But it did provide a prompt and reasonable explanation of Philadelphia's claimed factual and contractual bases for denying coverage.  I would therefore reverse the district court's finding that Philadelphia violated § 58-63-15(11)(n), reverse the award of attorneys' fees, and deny DENC's cross-appeal for treble damages under UDTPA.