An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-923

Filed 15 April 2026

Mecklenburg County, No. 22CVS011429-590

RESTOREPRO RECONSTRUCTION, INC., Plaintiff,

v.

GERALDINE F. SIMPSON, Defendant and Counterclaim Plaintiff,

v.

RESTOREPRO RECONSTRUCTION, INC. and STATE FARM FIRE AND CASUALTY COMPANY, Counterclaim Defendants.

Appeal by Defendant and cross-appeal by Counterclaim Defendant State Farm Fire and Casualty Company from order entered 22 May 2024 by Judge George C. Bell in Mecklenburg County Superior Court. Heard in the Court of Appeals 8 April 2025.

*Butler Snow, LLP, by Scott Lewis and Shelley W. Coleman, for the counterclaim-defendant-appellee and cross-appellant State Farm Fire and Casualty Company.*

*Capua Law Firm, P.A., by Natalia L. Talbot and Paul A. Capua, for the defendant-appellant and defendant-cross-appellee.*

*Jordan, Price, Wall, Gray, Jones & Carlton, PLLC, by Brian S. Edlin and Kyle A. Lewis, for the plaintiff-appellee and counterclaim-defendant-appellee Restorepro Reconstruction, Inc.*

STADING, Judge.

This appeal arises out of a collection action initiated by RestorePro

Reconstruction, Inc. ("RestorePro") against Geraldine F. Simpson ("Defendant"). RestorePro filed this action after rendering emergency services to Defendant without payment. Defendant answered the complaint; joined its insurer, State Farm Fire and Casualty Company ("State Farm"), as a party and asserted several counterclaims. Subsequently, RestorePro and State Farm moved for summary judgment on several claims and counterclaims at the close of discovery. Defendant also moved the trial court to compel discovery from State Farm under N.C. Gen. Stat. § 1A-1, Rule 37 (2025). The trial court entered an interlocutory order on 22 May 2024, ruling on all motions. Defendant appeals and State Farm cross-appeals from the trial court's order. Having conducted a meticulous review, we affirm the trial court's order in part, vacate in part, and reverse in part.

## I. Factual and Procedural Background

The record tends to show that on 18 November 2021, a large section of the ceiling in Defendant's home suddenly collapsed, leaving debris scattered throughout the living room. Shortly thereafter, Defendant reported the damage to her homeowner's insurance provider, State Farm. The State Farm agent who spoke with Defendant referred her to RestorePro, an emergency services provider.

On 19 November 2021, Leslie Turner, an estimator and project manager with RestorePro, conducted a walkthrough of Defendant's home. Upon arrival, Ms. Turner observed the age of the home, "what appeared to be asbestos type ceiling tile throughout," and debris across the living room. Ms. Turner told Defendant "that

[RestorePro] needed to test for asbestos before anything could be touched." She then gave Defendant a work authorization form (the "Contract") to sign, explaining the information would be shared with State Farm. She added, if the asbestos testing results were negative, RestorePro "could come and clean up the mess that fell." Defendant's daughter, Dorenthia Collins, who was physically present during the walkthrough, noted Ms. Turner was "adamant" about conducting an asbestos test and getting Defendant "out of the house because it wasn't safe." Ms. Collins also recalled Ms. Turner presented Defendant with the Contract, which Ms. Collins, although not having read the contract, believed Defendant was required to sign for RestorePro to proceed with the asbestos testing. Ms. Turner stated she gave Defendant and Ms. Collins an opportunity to read the Contract, which provided:

> This authorization is only for emergency services. This authorization does not extend to any work beyond emergency services, unless authorized and agreed in writing, and does not extend to any upgrades to the property desired by Property Owner, except as authorized and agreed to in writing. In the event the Property Owner engages RestorePro to do restoration work, Property Owner and RestorePro will enter into a separate contract which will supersede and replace this contract, provided however, that RestorePro payment rights hereunder will survive to the extent necessary for RestorePro to be compensated for its emergency services.
>
> Property Owner acknowledges that while RestorePro agrees to use its best judgment and efforts to stabilize and protect the property, RestorePro cannot and does not guarantee that the property or items can be restored to their condition prior to sustaining damage. Property Owner acknowledges that it is not possible in all cases to

restore property or items damaged by a traumatic occurrence to their condition before damage. In the event that the property or items described above cannot be restored to their original condition, Property Owner waives and releases any claims against RestorePro and its officers, directors and employees, and will instead pursue a claim for additional damage with Property Owner's insurance company. Property Owner, on behalf of its insurer waives all claims of subrogation insurer may have against RestorePro.

Property Owner further understands and acknowledges that RestorePro has not been retained to remediate or restore property and items damaged by mold, spores, fungi, or other living organisms. Property Owner expressly waives all claims against RestorePro for property damage or bodily injury caused by mold, spores, fungi, and other living organisms.

Property Owner understands that this is not a contract for reconstruction or restoration of damaged property, but only for emergency board ups and placing temporary tarps on roofs. While RestorePro provides reconstruction and restoration services, any such services must be the subject of another written contract.

Property Owner understands and acknowledges that Property Owner is liable to RestorePro for all payments invoiced by RestorePro pursuant to this authorization. Property Owner shall pay all invoices for services rendered under this authorization within 30 days of receipt. Failure to pay such invoices shall be treated as a default, entitling RestorePro to all costs of collection including a reasonable attorney's fee. Interest shall accrue on unpaid balances after default at a rate of 1.5% per month following default.

Property Owner assigns to RestorePro such proceeds of the above-referenced insurance policy, or other applicable policies, as shall be required to pay RestorePro fully for the services described in this work authorization, and direct the above-referenced insurance company to make

payments directly to RestorePro. Property Owner understands that while RestorePro will send invoices to insurance companies as an accommodation for its customers, Property Owner is ultimately responsible for all payments under this work authorization.

This is the entire agreement between Property Owner and RestorePro. No change, addition, modification, or waiver of any of the provisions of this contract shall be binding upon either party unless made in writing and signed by the authorized representative of each party.

THIS AUTHORIZATION EXTENDS TO EMERGENCY SERVICES ONLY, AND FURTHER WORK BY RESTOREPRO MUST BE THE SUBJECT OF A SEPARATE CONTRACT, AS AGREED IN WRITING BETWEEN PROPERTY OWNER & RESTOREPRO.

When presented with the Contract, Defendant telephoned her daughter's then-fiancé, Matthew Collins, seeking advice on "whether to sign it" since he was a general contractor. Defendant ultimately signed the Contract after she had consulted with Mr. Collins.

During the walkthrough, Ms. Turner also observed that nails, rather than screws, had been used for the ceiling. She testified that the use of nails was normal for a home built in 1946. In her opinion, Ms. Turner believed the collapse was due to "the hot to cold weather caus[ing] the ceiling to fall in." Ms. Turner also noted that "the area is dry [with] no water or plumbing. The installation is blown in. . . . [T]he ceiling is falling down, but [we] are waiting on the testing."

RestorePro did not collect samples or conduct the asbestos testing; rather, it outsourced the work to Mold Girl, LLC. After collecting ten samples on 19 November

2021, Mold Girl sent them to Hayes Microbial Consulting for testing. Hayes Microbial Consulting delivered its report three days later, concluding that none of the samples were positive for asbestos.

Before the test results came back, however, Mr. Collins and Defendant cleaned up and repaired the damage on 20 November 2021. Mr. Collins testified: he contacted Tony Hewitt to repair the ceiling and was referred to Jim Swords, who acted as Mr. Hewitt's subcontractor; Mr. Hewitt and Mr. Swords purchased all materials for the ceiling repair; Mr. Collins never received an invoice for the work completed or materials purchased, but paid Mr. Hewitt $2,300.00 for the ceiling repair; Mr. Collins repainted the home thereafter; the crown molding and carpet needed to be replaced; the living room walls needed to be re-painted once the crown molding was replaced; Mr. Collins purchased insulation and paint for his portion of the repairs; Mr. Collins paid an individual $150.00 to haul off materials; and Defendant gave Mr. Collins a check for $2,300.00, which he had not cashed.

When making the repairs, Mr. Collins observed that the ceiling had been fastened to the roof with what appeared to be "sheetrock nails." Mr. Collins observed that "some nails were still in the plasterboard. And there were some nails that were still in the joist." Mr. Collins described the sheetrock nails as,

> fairly flat, thin head, that's about five sixteenths of an inch in diameter. Shaft of the nail, probably about an eighth of an inch and then, I'm guessing again, inch and a quarter, maybe an inch and a half long. I did not do any of this with the measuring tape, but just familiarity with fasteners on

construction sites.

He also reported that he believed the weight of the ceiling caused it to separate from the nails since two additional layers of plaster had been added sometime in the past.

Ms. Turner notified Mr. Collins of the negative asbestos test results on 23 November 2021, which Mr. Collins relayed to Defendant. Mr. Collins testified that at this juncture, Defendant "was going to call State Farm and get a clearer picture of the process going forward." However, neither Mr. Collins nor Defendant contacted RestorePro to inform them of the cleanup work.

On 29 November 2021, Adrienne Sanders, an "assignment claim handler" with State Farm, contacted Mr. Collins to schedule an inspection of Defendant's home. Ms. Sanders inspected the home on 1 December 2021. During her walkthrough, Ms. Sanders took photos and observed "that the ceiling . . . had been replaced," prompting her to tell Defendant: "Hey, I need to see . . . the original damages." Ms. Sanders further observed: "the perimeter of the ceiling had been removed"; there was no "damage to the walls"; and there was "no visible, direct physical loss." Ms. Sanders noted that since "the repairs had been completed," she requested photos of the original physical damage.

On 8 December 2021, State Farm denied Defendant's insurance claim since her policy excluded coverage for "damage involving collapse and materials used in repair, construction, renovation or remodeling." Ms. Sanders testified that "the policy is very specific as to when collapse applies," and that "based on [her] inspection," the

criteria for collapse had not been satisfied.

As a result, RestorePro generated an invoice in the amount of $1,998.11 for the services rendered. The invoice itemized the following items: $240.07 for the "[e]mergency service call - during business hours"; $180.04 for the Hazardous Waste/Mold Cleaning Technician; $408.00 for the Asbestos test base fee; $810.00 for the asbestos test materials; and $360.00 for the "air clearance-per sample." RestorePro sent Defendant a collection letter on 18 April 2022, requesting that Defendant pay $2,117.99. The collection letter outlined that Defendant owed $1,998.11 for the services rendered and $119.88 in late fees and interest. Defendant refused to pay the invoice. RestorePro thus filed a complaint against Defendant in the District Court Division of Mecklenburg County on 15 July 2022. The complaint asserted claims for breach of contract, enforcement of a claim of lien on real property,[1] and "quantum meruit/unjust enrichment."

Defendant answered, joined State Farm as a party to the action, and asserted several counterclaims, including: unfair and deceptive trade practices ("UDTPA counterclaims") against RestorePro and State Farm, both individually and jointly; slander of title against RestorePro; breach of contract against State Farm; and declaratory judgment against both RestorePro and State Farm. Defendant asserted she did not pay for RestorePro's services because State Farm wrongfully denied

---

[1] RestorePro later voluntarily dismissed its claim for enforcement of a claim of lien.

coverage under the homeowner's insurance policy. Defendant maintained RestorePro and State Farm acted in-concert to deny coverage, and RestorePro had not "perform[ed] emergency services . . . [or] given, much less approved, an estimate for such services[.]" Defendant simultaneously moved to transfer the action to the Superior Court Division "given that the counterclaims sued on . . . exceed[ed] $25,000.00." A consent order was later entered, transferring the matter to the Superior Court Division of Mecklenburg County.

Pertinent to Defendant's UDTPA counterclaims, both RestorePro and State Farm independently contracted with a network service provider known as Contractor Connections ("CC"), which allowed both to receive referrals through CC's network service provider portal. However, it was maintained that there was never a "Premier Service Program assignment" for Defendant's matter, and RestorePro never acted as a service provider under State Farm's Premier Service Program.

Both RestorePro and State Farm moved for summary judgment on several claims and counterclaims at the close of discovery. Defendant also moved the trial court to compel discovery from State Farm under N.C. Gen. Stat. § 1A-1, Rule 37. The trial court entered its order on 22 May 2024, ruling on all motions.

That order: (1) denied summary judgment on RestorePro's claim for breach of contract; (2) partially granted summary judgment on RestorePro's claim for quantum meruit/unjust enrichment as to Defendant's liability, but denied summary judgment on the issue of damages; (3) granted summary judgment in favor of RestorePro on

Defendant's UDTPA counterclaim against RestorePro; (4) denied summary judgment in favor of Defendant on her UDTPA counterclaim against State Farm; (5) granted summary judgment in favor of RestorePro and State Farm on Defendant's joint UDTPA counterclaim; (6) granted summary judgment in favor RestorePro on Defendant's slander of title counterclaim against RestorePro; (7) denied summary judgment in favor of Defendant on its breach of contract counterclaim against State Farm; (8) granted summary judgment in favor of RestorePro and State Farm's on Defendant's joint declaratory judgment counterclaim; and (9) denied Defendant's motion to compel discovery. Accordingly, the following survived summary judgment: RestorePro's breach of contract claim against Defendant; RestorePro's quantum meruit/unjust enrichment claim against Defendant as to the issue of damages; Defendant's breach of contract counterclaim against State Farm; and Defendant's individual UDTPA counterclaim against State Farm.

The trial court certified its order "for immediate appeal with no just reason for delay pursuant to Rule 54(b) of the North Carolina Rules of Civil Procedure." It added, "[s]hould any party timely appeal from this Order, this action shall be STAYED in its entirety upon the filing date of any notice of appeal from this Order, pursuant to N.C. [Gen. Stat.] § 1-294 [(2025)]." Defendant timely appeals and State Farm timely cross-appeals from the trial court's order.

## II. Jurisdiction

Although the trial court's order is interlocutory, and interlocutory orders

ordinarily are not immediately appealable, this Court has jurisdiction since the trial court provided a Rule 54(b) certification. N.C. Gen. Stat. § 1A-1, R. 54 (2025).

## III. Analysis

Defendant raises several challenges to the trial court's order. Defendant asserts the trial court erred in denying her motion to compel discovery from State Farm. Defendant also argues the trial court erred in: granting summary judgment in favor of State Farm and RestorePro on Defendant's joint UDTPA counterclaim; denying summary judgment on her individual UDTPA counterclaim against State Farm; granting summary judgment on her individual UDTPA counterclaim against RestorePro; and the trial court erred in granting partial summary judgment in favor of RestorePro on its quantum meruit/unjust enrichment claim. On cross-appeal, State Farm argues that the trial court erred in denying State Farm summary judgment on Defendant's counterclaim for breach of contract, including the implied covenant of good faith and fair dealing. Finally, State Farm argues the trial court erred in denying it summary judgment on Defendant's individual UDTPA counterclaim against State Farm.

### A. Motion to Compel

Defendant asserts the trial court abused its discretion by denying her Rule 37 motion to compel discovery from State Farm. Defendant asserts the discovery she sought to compel "is highly relevant to her [UDTPA counterclaims] against State Farm and RestorePro." She maintains that State Farm should be compelled to

"disclose the full nature of its relationship with RestorePro and [CC]" since the information "will likely prove that State Farm engages in an unfair insurance practice for the purpose of evading payment on claims[.]"

Under North Carolina law, parties may obtain discovery by one or more of the following methods enumerated by statute: "depositions upon oral examination or written questions; written interrogatories; production of documents or things or permission to enter upon land or other property, for inspection and other purposes; physical and mental examinations; and requests for admission." N.C. Gen. Stat. § 1A-1, Rule 26(a) (2025). Generally, "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action[.]" *Id.* § 1A-1, R. 26(b)(1). "The relevancy test for discovery is not the same as the relevancy test for admissibility into evidence." *Shellhorn v. Brad Ragan, Inc.*, 38 N.C. App. 310, 314, 248 S.E.2d 103, 106 (1978). "To be relevant for purposes of discovery, the information need only be 'reasonably calculated' to lead to the discovery of admissible evidence." *Id.*; *Adams v. Lovette*, 105 N.C. App. 23, 29, 411 S.E.2d 620, 624 (1992); *Willis v. Duke Power Co.*, 291 N.C. 19, 34, 229 S.E.2d 191, 200 (1976).

"One of the primary purposes of the discovery rules is to facilitate the disclosure prior to trial of any unprivileged information that is relevant and material to the lawsuit so as to permit the narrowing and sharpening of the basic issues and facts that will require trial." *Am. Tel. & Tel. Co. v. Griffin*, 39 N.C. App. 721, 726, 251 S.E.2d 885, 888 (1979). To that end, "the discovery rules 'should be constructed

liberally' so as to substantially accomplish their purposes." *Id.* at 727, 251 S.E.2d at 888 (quoting *Willis*, 291 N.C. at 34, 229 S.E.2d at 200). Nonetheless, "neither party should be allowed to roam at will in the closets of the other." *Willis*, 291 N.C. at 34, 229 S.E.2d at 200.

N.C. Gen. Stat. § 1A-1, Rule 37 provides:

> A party, upon reasonable notice to other parties and all persons affected thereby, may apply for an order compelling discovery as follows:
>
> . . . .
>
> (2) Motion. — If a deponent fails to answer a question propounded or submitted under Rules 30 or 31, or a corporation or other entity fails to make a designation under Rule 30(b)(6) or 31(a), or a party fails to answer an interrogatory submitted under Rule 33, or if a party, in response to a request for inspection submitted under Rule 34, fails to respond that inspection will be permitted as requested or fails to permit inspection as requested, the discovering party may move for an order compelling an answer, or a designation, or an order compelling inspection in accordance with the request.

The administration of Rule 37 "lies necessarily within the province of the trial courts[.]" *Carpenter v. Cooke*, 58 N.C. App. 381, 385, 293 S.E.2d 630, 632 (1982). "Whether or not the party's motion to compel discovery should be granted or denied is within the trial court's sound discretion and will not be reversed absent an abuse of discretion." *Wagoner v. Elkin City Sch.' Bd. of Educ.*, 113 N.C. App. 579, 585, 440 S.E.2d 119, 123 (1994); *Friday Invs., LLC v. Bally Total Fitness of the Mid-Atl., Inc.*, 370 N.C. 235, 241, 805 S.E.2d 664, 669 (2017) (citations and quotation marks omitted)

("A trial court's discovery ruling is reviewed for abuse of discretion and will be overturned only upon a showing that its ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision[.]").

Here, Defendant's motion to compel asserted that State Farm and RestorePro maintained an undisclosed business relationship as follows:

> 4. The Counterclaim alleges, among other things, that after [Defendant] reported her ceiling collapse to State Farm, State Farm referred her to RestorePro to help her with her emergency. At the time, [Defendant] was not aware that State Farm and RestorePro had long-standing business relationship or that RestorePro was participating contractor in State Farm's managed repair program called the "Premier Service Program" since at least mid-2020. Neither RestorePro nor State Farm disclosed this to [Defendant].
>
> . . . .
>
> 6. As alleged in the Counterclaim, the undisclosed relationship between State Farm and RestorePro is central issue in the case.
>
> 7. During this discovery, [Defendant] had requested the production of agreements pertaining to the relationship between State Farm and RestorePro and questioned witnesses about any existing referral or preferred service relationship between the two companies. No such documents were produced and there was no acknowledgement by RestorePro or State Farm of any formal arrangement between the two companies.
>
> 8. [Defendant] then sought to take 30(b)(6) deposition of State Farm representative about the relationship between State Farm and RestorePro. In response to that notice, State Farm filed motion for protective order, which postponed the deposition on this issue. The motion for

protective order was later heard by this Court. In sum, the Court permitted [Defendant] to depose State Farm's representative on the parties' relationship, with some limitations. The Court announced that it would prepare an order. The deposition of State Farm's 30(b)(6) representative was rescheduled to proceed on September 7, 2023.

9. On September 6, 2023[,] the day before the rescheduled deposition of State Farm and before the Court issued its order State Farm sent an email to Counterclaim Plaintiff disclosing that RestorePro was participating contractor in State Farm's Premier Service Program through third-party referral company called Contractor Connection. Bottom line, RestorePro is subcontractor to Contractor Connection's prime contract with State Farm.

. . . .

15. RestorePro stated that the agreement between Contractor Connection and RestorePro was confidential, and that it would agree to produce copy of the agreement if [Defendant] signed confidentiality agreement.

16. On October 30, 2023, Confidentiality Agreement was entered into between all parties pertaining to the disclosure of the agreement between RestorePro and Contractor Connection.

17. For its part, State Farm refused to produce its agreement with Contractor Connection, among other documents related to its Premier Service Program. In good faith effort to obtain the documents before the rescheduled deposition of State Farm, [Defendant] notified State Farm of the information that remained outstanding, to which State Farm responded it would not comply. . . .

18. On November 3, 2023, [Defendant] conducted the deposition of State Farm's 30(b)(6) witness regarding State Farm's Premier Service Program, in which the deponent testified to the existence of the agreement between State Farm and Contractor Connection the same agreement that

State Farm refused to produce.

> 19. As will be demonstrated more fully at the hearing on this Motion, State Farm's objections to the production of the agreement between State Farm and Contractor Connection are groundless and should be overruled. The agreement is directly related to the issues raised by [Defendant] in the Counterclaims and there is no good or justifiable reason for failing to produce it.

In light of these allegations, Defendant requested that the trial court compel State Farm to produce the following documents:

> a. All contracts or agreement[s] between State Farm and Contractor Connection in effect on or about November 19, 2021;
>
> b. Any disclosures that State Farm provides its insureds when State Farm has initiated the Premier Services Program; and
>
> c. Descriptions, rules, policies, guidelines, and handbooks pertaining to State Farm's Premier Services Program and Contractor Services Program applicable to Contractor Connection.

The trial court ultimately denied Defendant's motion since "good grounds d[id] not exist for compelling State Farm to provide the discovery" Defendant sought.

Our review leads us to hold that the trial court did not abuse its discretion by denying Defendant's motion to compel discovery from State Farm since the materials sought are irrelevant to Defendant's counterclaims. *See, e.g., Wagoner*, 113 N.C. App. at 585, 440 S.E.2d at 123 ("Plaintiff has failed to meet her burden of proving that her requests relate to information both relevant and necessary to her claims."); *Howlett v. CSB, LLC*, 164 N.C. App. 715, 722, 596 S.E.2d 899, 904 (2004) ("In the absence of

a showing that the discovery sought was relevant to that question, any error in denying plaintiffs' motion to compel was harmless."). Several of Defendant's counterclaims rest on the assertion that RestorePro and State Farm—through their independent contracts with CC and State Farm's Premier Service Program—unfairly colluded to deny Defendant's insurance claim. However, the record tends to show that State Farm never offered its Premier Service Program to Defendant, and that the insurance agent whom Defendant spoke with did not have the authority to offer State Farm's Premier Service Program:

> 5. During this initial call, State Farm did not determine that [Defendant's] loss was eligible for State Farm's Premier Service Program and State Farm did not offer use of its Premier Service Program to [Defendant].
>
> . . . .
>
> 15. Mr. Snider does not have authority to offer State Farm's Premier Services Program to his customers.
>
> 16. When Mr. Snider's employee provided [Defendant] with the name and telephone number for RestorePro on November 19, 2021, he did not do so as part of State Farm's Premier Service Program. When [Defendant] contacted RestorePro for services, she did not do so through State Farm's Premier Service Program.

The record does not show a "Premier Service Program assignment" was made for Defendant's matter, and RestorePro never acted as a service provider under State Farm's Premier Service Program. Compelling the discovery of documents pertaining to State Farm's Premier Service Program is irrelevant to Defendant's counterclaims

against both RestorePro and State Farm since it is not "'reasonably calculated' to lead to the discovery of admissible evidence." *Shellhorn*, 38 N.C. App. at 314, 248 S.E.2d at 106 (citation omitted).

Although both RestorePro and State Farm independently contracted with CC and utilized their network portal, the record reflects that Defendant's matter "did not come through" CC. Instead, State Farm's call log reflects that an agent "gave [Defendant] RestorePro's number to call right away." And the person in charge of the business operations at RestorePro, Scott Gilbert, testified that RestorePro's contract with CC had no bearing on the resolution of Defendant's matter:

> Q. And in any event, the Simpson matter -- issue, did not come through any kind of third-party administrator; is that correct?
>
> A. That's correct.
>
> Q. It came through an insurance agent who we had marketed in the past; is that right?
>
> A. Through her -- through -- yes, and through [Defendant] herself.
>
> Q. Okay. And Contractor Connections, the agreement that we've been discussing today, didn't have any relationship to the [Defendant's] case at any point; is that right?
>
> A. That's correct.
>
> Q. And there was never a Contractor Connection's assignment through the portal for the [Defendant's] matter?
>
> A. That's correct.

Q. And as a result of it never being assigned through Contractor Connections, the terms that are outlined in the Contractor Connections agreement that was produced do not apply to the Simpson matter; is that correct?

A. That's correct.

Q. And as a result of it never going through the Contractor Connections portal or assignment process, nothing was ever paid in the form of any commissions or fees to Contractor Connections for the Simpson job; is that right?

A. That's correct.

A CC assignment for Defendant's matter was never generated within CC's portal, rendering the contract between State Farm and CC irrelevant to this case. *Wagoner*, 113 N.C. App. at 585, 440 S.E.2d at 123; *Howlett*, 164 N.C. App. at 722, 596 S.E.2d at 904; *Shellhorn*, 38 N.C. App. at 314, 248 S.E.2d at 106. Accordingly, we hold the trial court did not abuse its discretion in denying Defendant's motion to compel. *Wagoner*, 113 N.C. App. at 585, 440 S.E.2d at 123.

## B. Summary Judgment

N.C. Gen. Stat. § 1A-1, Rule 56 (2025) provides the rules and procedures pertaining to summary judgment in North Carolina. Rule 56 states that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c). "[A] fact is 'material' if it would constitute or irrevocably establish any material element of a claim or a

defense." *Lowe v. Bradford*, 305 N.C. 366, 369, 289 S.E.2d 363, 366 (1982). On the other hand, "[a] 'genuine issue' is one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83, 83, 530 S.E.2d 829, 835, 835 (2000) (quoting *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 534, 180 S.E.2d 823, 830 (1971)).

The "movant is entitled to summary judgment . . . when only a question of law arises based on undisputed facts." *Parkes v. Hermann*, 376 N.C. 320, 323, 852 S.E.2d 322, 324 (2020) (quoting *Ussery v. Branch Banking & Tr. Co.*, 368 N.C. 325, 334, 777 S.E.2d 272, 278 (2015)) (citation omitted). Indeed, the purpose of summary judgment "is to eliminate formal trials where only questions of law are involved." *Kessing*, 278 N.C. at 534, 180 S.E.2d at 830. The showing required for summary judgment "may be accomplished by proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of her claim." *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835. "Generally[,] this means that on 'undisputed aspects of the opposing evidential forecast,' where there is no genuine issue of fact, the moving party is entitled to judgment as a matter of law." *Lowe*, 305 N.C. at 369, 289 S.E.2d at 366 (citation omitted).

"The party moving for summary judgment bears the burden of bringing forth a forecast of evidence which tends to establish that there is no triable issue of material fact." *Creech v. Melnik*, 347 N.C. 520, 526, 495 S.E.2d 907, 911 (1998). When "the

moving party meets this burden, the non-moving party must in turn either show that a genuine issue of material fact exists for trial or must provide an excuse for not doing so." *Lowe*, 305 N.C. at 369, 289 S.E.2d at 366. If a motion for summary judgment is made and supported as provided in Rule 56:

> an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

N.C. Gen. Stat. § 1A-1, Rule 56(e). But "[i]f the moving party fails to meet his burden, summary judgment is improper regardless of whether the opponent responds. The goal of this procedural device is to allow penetration of an unfounded claim or defense before trial." *Lowe*, 305 N.C. at 369, 289 S.E.2d at 366 (citation omitted). Similarly, "[i]f there is any question as to the credibility of witnesses or the weight of evidence, a summary judgment should be denied[.]" *Kessing*, 278 N.C. at 535, 180 S.E.2d at 830 (citation omitted).

"The standard of review of an appeal from summary judgment is de novo." *Morrell v. Hardin Creek, Inc.*, 371 N.C. 672, 680, 821 S.E.2d 360, 366 (2018). "'Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment' for that of the lower tribunal." *Craig v. New Hanover Cnty. Bd. of Educ.*, 363 N.C. 334, 337, 678 S.E.2d 351, 354 (2009) (citations omitted). "A ruling on a motion for summary judgment must consider the evidence in the light most favorable

to the non-movant, drawing all inferences in the non-movant's favor." *Morrell*, 371 N.C. at 680, 821 S.E.2d at 366.

### 1. *Defendant's UDTPA Counterclaims*

Defendant maintains the trial court erroneously granted summary judgment for RestorePro and State Farm on Defendant's joint UDTPA counterclaim, and RestorePro on Defendant's individual UDTPA counterclaim. Defendant further contends that the trial court erroneously denied summary judgment on her individual UDTPA counterclaim against State Farm.

The North Carolina UDTPA is codified under N.C. Gen. Stat. § 75-1.1 et seq. (2025). "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." *Id.* § 75-1.1(a). "The law was enacted to establish an effective private cause of action for aggrieved consumers in this State, and it was needed because common law remedies had proved often ineffective." *Bhatti v. Buckland*, 328 N.C. 240, 245, 400 S.E.2d 440, 443 (1991) (citation and quotation marks omitted). To that end, Chapter 75 provides the following mechanism to enforce the provisions of Section 75-1.1:

> If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict.

N.C. Gen. Stat. § 75-16 (2025).

"In order to establish a *prima facie* claim for unfair trade practices, a plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *SciGrip, Inc. v. Osae*, 373 N.C. 409, 426, 838 S.E.2d 334, 347 (2020) (quoting *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001)) (citation omitted); *Nobel v. Foxmoor Grp.*, 380 N.C. 116, 120, 868 S.E.2d 30, 33 (2022).

"Whether a trade practice is unfair or deceptive usually depends upon the facts of each case and the impact the practice has in the marketplace." *Marshall v. Miller*, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Id*. And "a practice is deceptive if it has the capacity or tendency to deceive; proof of actual deception is not required." *Id.* That said, "the consumer need only show that an act or practice possessed the tendency or capacity to mislead, or created the likelihood of deception, in order to prevail under the states' unfair and deceptive practices act." *Id.* "The question of what constitutes an unfair or deceptive trade practice is an issue of law. If the material facts are not disputed, the court should determine whether the defendant's conduct constituted an unfair or deceptive trade practice." *Nelson v. Hartford Underwriters Ins. Co.*, 177 N.C. App. 595, 609, 630 S.E.2d 221, 231 (2006) (citation omitted).

As for the second element—in or affecting commerce—the UDTPA defines "commerce" as "all business activities, however denominated, but does not include professional services rendered by a member of a learned profession." N.C. Gen. Stat. § 75-1.1(b). "The term [b]usiness activities . . . connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized." *Nobel*, 380 N.C. at 120, 868 S.E.2d at 33 (citation and quotation marks omitted).

As to the final element, "[u]nder the UDTPA, proximate cause is a question of fact." *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 174 N.C. App. 49, 62, 620 S.E.2d 222, 232 (2005). "It must be shown that the plaintiff suffered actual injury as a proximate result of defendant's deceptive statement or misrepresentation." *Pearce v. Am. Def. Life Ins. Co.*, 316 N.C. 461, 471, 343 S.E.2d 174, 180 (1986).

Relevant here, N.C. Gen. Stat. § 58-63-15(11) (2025) "enumerates a list of practices which are, as a matter of law, instances of unfair and deceptive conduct. Violation of any form of conduct listed in § 58-63-15(11) operates as a *per se* instance of unfair and deceptive trade practice under N.C. Gen. Stat. § 75-1.1." *Murray v. Nationwide Mut. Ins. Co.*, 123 N.C. App. 1, 9, 472 S.E.2d 358, 362 (1996). "Our courts have repeatedly defined the insurance business as affecting commerce, when an insurer provides insurance to a consumer purchasing a policy." *Id.* at 10, 472 S.E.2d at 363

### a. *Defendant's Joint UDTPA Counterclaim*

Defendant asserts the trial court erroneously granted summary judgment for RestorePro and State Farm with respect to Defendant's joint UDTPA counterclaim. Defendant asserts State Farm and RestorePro engaged in an unfair and deceptive trade practice by "failing to disclose their [contractual] relationship." Defendant maintains RestorePro and State Farm unfairly used this contractual relationship to deny her coverage under State Farm's policy. She also maintains that RestorePro and State Farm "were unfairly colluding to serve their own interests to [her] detriment."

A close review of the record demonstrates that RestorePro and State Farm were not engaged in a contractual relationship as Defendant alleges. Defendant therefore cannot demonstrate the first element of her joint UDTPA claim. *Dalton*, 353 N.C. at 656, 548 S.E.2d at 711. Thus, no genuine issue of material fact remains, and both RestorePro and State Farm were entitled to summary judgment on Defendant's joint UDTPA claim.

When RestorePro moved for summary judgment, it noted that Defendant "cannot forecast any evidence showing that RestorePro engaged in unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1 on the basis of a purported nefarious undisclosed relationship between RestorePro and State Farm when the undisputed facts show otherwise." RestorePro attached an affidavit from Mr. Alan Piercy, a team manager with State Farm, to support its motion. That affidavit

provided that State Farm never offered its Premier Service Program to Defendant, and that the insurance agent whom Defendant spoke with did not have the authority to offer State Farm's Premier Service Program.

Additionally, State Farm's motion for summary judgment noted that Defendant cannot demonstrate such a contractual relationship between RestorePro and State Farm in light of the undisputed evidence obtained through discovery:

> [Defendant] cannot forecast any evidence showing that State Farm and RestorePro together committed any unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1 as the undisputed material facts show that State Farm and RestorePro did not have any contract with each other, that State Farm did not send or refer RestorePro to [Defendant], that [Defendant] requested that RestorePro come to her house to assist with the damage, that [Defendant] voluntarily entered into a contract with RestorePro, that RestorePro performed the services that [Defendant] authorized, that RestorePro billed [Defendant] for those services based on its industry standards without any input or agreement with State Farm, and that State Farm made its claim decision based on [Defendants'] visual observations, photographs that showed the conditions as they existed after the ceiling fell, verbal representations of [Defendant] and Mr. Collins, and the policy provisions.

Although Defendant submitted her own affidavit claiming there was a "pre-existing arrangement between State Farm and RestorePro," the record shows no such agreement existed. Record evidence shows that State Farm did not "have any contracts with RestorePro or any other specific individual contractors," and the last period of time in which State Farm contracted with specific contractors was "approximately 2013, 2014." For these reasons, we hold that the trial court did not

commit error by granting summary judgment for RestorePro and State Farm on Defendant's joint UDTPA counterclaim. Defendant's assignment of error is overruled.

### b. *Defendant's UDTPA Counterclaim Against RestorePro*

Defendant asserts the trial court erroneously granted summary judgment for RestorePro on Defendant's individual UDTPA counterclaim. Defendant maintains that RestorePro engaged in unfair and deceptive trade practices by: deceiving Defendant into signing the Contract; fraudulently billing Defendant for emergency services it did not perform, and that Defendant did not consent to; charging Defendant a fee that did not reflect the actual work RestorePro completed; and filing a materially false and fictitious mechanics lien on Defendant's home.

With respect to Defendant's first argument—that she was deceived into signing the Contract—the record evidence does not support this assertion, and no genuine issue of material fact remains. Consequently, RestorePro was entitled to summary judgment. N.C. Gen. Stat. § 1A-1, Rule 56(b)(1), (e); *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835. Indeed, Defendant's own deposition reflects that when presented with the Contract, she telephoned Mr. Collins, seeking advice on "whether to sign it" since he was a general contractor. Defendant ultimately agreed to the testing and signed the Contract, after consulting Mr. Collins, who told her to sign it. Ms. Collins, who was physically present during Ms. Turner's walkthrough, also testified that Defendant agreed to RestorePro conducting the testing and signed the

Contract. Additionally, Ms. Turner stated she gave Defendant and Ms. Collins an opportunity to read the Contract, and that neither had any questions.

As to Defendant's next two arguments, she fails to delineate *which* services RestorePro billed her for that it did not complete. *See* N.C. R. App. P. 28(b)(6). In any event, RestorePro's invoice itemized the following matters, all of which touch and concern the services rendered by RestorePro and its subcontractor, Mold Girl LLC: $240.07 for the emergency services call during business hours; $180.04 for the Hazardous Waste/Mold Cleaning Technician; $408.00 for the Asbestos test base fee; $810.00 for the asbestos test materials; and $360.00 for the air clearance per sample.

Finally, with respect to RestorePro filing a materially false and fictitious mechanics lien on Defendant's home, we hold that appellate review of this question is unnecessary, as RestorePro voluntarily dismissed its claim for enforcement of a claim of lien on 16 December 2022—long before the trial court's order rendered on 22 May 2024. Moreover, at the motion hearing, counsel for RestorePro explained that it voluntarily dismissed the claim of lien since it accidentally wrote the incorrect last date of work.

Accordingly, the trial court did not err by granting summary judgment for RestorePro on Defendant's individual UDTPA counterclaim. Defendant's assignment of error is overruled.

### c. *Defendant's UDTPA Counterclaim Against State Farm*

Defendant asserts the trial court erroneously denied summary judgment on

her individual UDTPA counterclaim against State Farm. Defendant maintains the trial court should have awarded summary judgment in her favor because no genuine issue of material fact remained as to whether State Farm engaged in an unfair and deceptive trade practice. To that end, Defendant asserts that State Farm: misrepresented pertinent facts relating to coverage in violation of N.C. Gen. Stat. § 58-63-15(11)(a); failed to conduct a reasonable investigation in violation of N.C. Gen. Stat. § 58-63-15(11)(d); and failed to promptly provide a reasonable explanation for the denial of Defendant's claim in violation of N.C. Gen. Stat. § 58-63-15(11)(n).

"[T]he relationship between N.C. [Gen. Stat.] § 75-1.1, which prohibits unfair and deceptive acts or practices, and N.C. [Gen. Stat.] § 58-63-15(11), which defines unfair practices in the settlement of insurance claims" has been previously addressed by our Courts. *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 62, 529 S.E.2d 676, 678 (2000). "Trade practices in the insurance business are regulated by Chapter 58, Article 63 of the North Carolina General Statutes. Unfair and deceptive trade practices are prohibited generally, and unfair and deceptive claim settlement practices are prohibited specifically[.]" *Nelson*, 177 N.C. App. at 608, 630 S.E.2d at 230 (citations omitted).

"N.C. Gen. Stat. § 58-63-15(11) enumerates a list of practices which are, as a matter of law, instances of unfair and deceptive conduct." *Murray*, 123 N.C. App. at 10, 472 S.E.2d at 363. "The [v]iolation of any form of conduct listed in [subsection] 58-63-15(11) operates as a *per se* instance of unfair and deceptive trade practice under

N.C. Gen. Stat. § 75-1.1." *Id.* That said, "[a] plaintiff must prove not only a violation of G.S. 75-1.1 by [a] defendant, but also . . . actual injury as a proximate result" of a defendant's actions. *Ellis v. Smith-Broadhurst, Inc.,* 48 N.C. App. 180, 184, 268 S.E.2d 271, 273–74 (1980) (citation omitted).

Relevant here, subsection 58-63-15(11) provides that the following conduct amounts to an unfair and deceptive trade practice:

> a. Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;
>
> . . . .
>
> d. Refusing to pay claims without conducting a reasonable investigation based upon all available information;
>
> . . . .
>
> n. Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

N.C. Gen. Stat. § 58-63-15(11)(a), (d), (n).

Defendant maintains that State Farm misrepresented pertinent facts as to her insurance policy by failing to disclose its contractual relationship with RestorePro. In doing so, Defendant "fully" incorporated its arguments pertaining to the trial court's grant of summary judgment for RestorePro and State Farm on Defendant's joint UDTPA counterclaim. But since we have already determined no such contractual relationship exists between State Farm and RestorePro, Defendant's contention is meritless. Accordingly, we decline further consideration since we have

already addressed these arguments in subsection B(1)(a) of this opinion.

Defendant next argues that State Farm failed to conduct a reasonable investigation into Defendant's insurance claim, thus amounting to an unfair and deceptive trade practice. *See, e.g., Country Club of Johnston Cnty., Inc. v. United States Fid. & Guar. Co.*, 150 N.C. App. 231, 247, 563 S.E.2d 269, 280 (2002). Defendant maintains that State Farm's investigation was "unscrupulous, unethical, and deceptive" because it "relied upon information it was covertly fed by RestorePro *before* State Farm inspected [Defendant's] home."

The undisputed evidence shows that Ms. Sanders, an agent of State Farm, conducted a reasonable investigation of Defendant's home based on all available information at the time. During her walkthrough on 1 December 2021, Ms. Sanders took photos and observed "that the ceiling . . . had been replaced," prompting her to tell Defendant: "Hey, I need to see . . . the original damages." At this point, Ms. Sanders observed: "the perimeter of the ceiling had been removed"; there was no "damage to the walls"; and there was "no visible, direct physical loss." Given that the damage had already been repaired by Mr. Collins, Ms. Sanders relied on all other available information, including RestorePro's photos, RestorePro's reports, Mr. Collins's photos, and Mr. Collins's statements. Contrary to Defendant's urging, State Farm did not covertly use RestorePro's photos or reports. In fact, when Ms. Turner presented Defendant with the Contract to conduct the asbestos testing, Ms. Turner explained the information would be shared with State Farm. Moreover, Defendant's

daughter, Ms. Collins, conceded that neither her nor Defendant had any objections to RestorePro taking photos.

Additionally, the record tends to show Ms. Sanders did not investigate the attic for water damage since: no water damage was reported by Defendant, RestorePro, or Mr. Collins; there was no visible water damage during Ms. Sander's inspection of the home; RestorePro's photos did not show any sort of water stains or damage to the ceiling joists; and RestorePro's report noted that "the area" was dry "with no water or plumbing." In fact, the log of Defendant's initial call to State Farm notes: named insured "states ceiling caving in is not due to water damage." Accordingly, Defendant's arguments are overruled.

Defendant next contends that State Farm failed to promptly provide a reasonable explanation for the denial of her claim, thus amounting to an unfair and deceptive trade practice. Defendant maintains this case is analogous to *Denc, LLC v. Phila. Indem. Ins. Co.*, 32 F.4th 38 (4th Cir. 2022) (hereinafter "*DENC III*"). Defendant correctly notes that an insurer must "do more than list all potentially applicable policy terms alongside the facts" when providing an explanation for the denial of coverage to its insured. *Id.* at 51. "Indeed, an insurer must reasonably explain the denial's basis in the insurance policy *in relation to* the facts." *Id.* But "insurers need not write a sophisticated legal memorandum"; they merely need to "bridge the gap between policy and fact." *Id.*

In *DENC III*, the United States Court of Appeals for the Fourth Circuit was

tasked with determining whether an insurance company engaged in an unfair and deceptive trade practice under subsection 58-63-15(11)(n) by failing to "provide a reasonable explanation of the basis in the insurance policy in relation to the facts . . . for denial of a claim." *Id.* at 50. The matter dealt with a dispute between an insured apartment complex owner, DENC, and its insurer, Philadelphia Indemnity Insurance Company. *Id.* at 42–43. The *DENC* case was first decided by the United States District Court for the Middle District of North Carolina ("*DENC I*"). *DENC I, LLC v. Phila. Indem. Ins. Co.*, 421 F. Supp. 3d 224, 226 (M.D.N.C. 2019). The *DENC I* Court granted summary judgment for the insured on the issue of insurance coverage, as Philadelphia's policy covered the collapse in question. *Id.* It also reserved the remaining summary judgment motions for future resolution. *Id.*

The Middle District later "resolved the remaining aspects of the pending summary judgment motions." in "*DENC II*". *DENC II, LLC v. Phila. Indem. Ins. Co.*, 426 F. Supp. 3d 151, 154 (M.D.N.C. 2019). Relevant here, in *DENC II*, both Philadelphia and the insured moved for summary judgment on the insured's UDTPA claims, which were grounded in violations of N.C. Gen. Stat. § 58-63-15(11)(a), (d), (g), (n). *Id.* The *DENC II* Court ultimately determined that Philadelphia violated subsection 58-63-15(11)(n) and granted summary judgment for the insured on its UDTPA claim. *Id.* at 157. The Court reasoned that Philadelphia violated subsection 58-63-15(11)(n) since: (1) Philadelphia sent "conflicting letters" to the insured about coverage; (2) nothing in Philadelphia's "denial letter link[ed] the basis in the

insurance policy . . . to the facts, as required by § 58-63-15(11)(n)"; and (3) Philadelphia's denial letter contained several provisions that were not a part of the insured's policy or did not apply to the collapse at issue. *Id.* at 155–56. And with respect to the proximate cause element of the insured's UDTPA claim, the Court determined as follows:

> As to the third element, it is undisputed that Philadelphia did not pay anything on a valid insurance claim submitted by DENC, so DENC has proven that Philadelphia proximately injured DENC. *See Cullen v. Valley Forge Life Ins. Co.*, 161 N.C. App. 570, 580, 589 S.E.2d 423, 431 (2003) (insurance letter wrongfully denying coverage under § 58-65-15(1) met injury element for § 75-1.1); *cf. Barbour*, 361 F. Supp. 3d at 575 (no injury to § 75-1.1 plaintiff where insurer "ultimately paid the full accidental death benefit with interest"); *Blis Day Spa*, 427 F. Supp. 2d at 635 (no injury where § 75-1.1 plaintiff lacked evidence defendant "ever delayed payments"). While Philadelphia contends DENC has not demonstrated any injury due to § 75-1.1 violations that is "separate from" the damages resulting from Philadelphia's breach of contract, . . . such separate or different damages are not required. *Cullen*, 161 N.C. App. at 580, 589 S.E.2d at 431 ("the same injury forming the basis for plaintiff's breach of contract claim . . . is also sufficient for the purposes of an unfair and deceptive practices claim") . . . .

*Id.* at 157 (citations omitted). Since it was "undisputed that Philadelphia" wrongfully denied its insured coverage on a valid insurance claim, the Court concluded that the proximate cause and injury element of the insured's UDTPA claim was satisfied. *Id.* Thus, the *DENC II* court relied on the fact that the *DENC I* court granted summary judgment on the issue of insurance coverage to establish the proximate cause element

of DENC's UDTPA claim.  *Id.*

On appeal, in "*DENC III,*" Philadelphia argued that "the [*DENC II*] court erred in finding that it violated the UDTPA."  *DENC III,* 32 F.4th at 50.  The Fourth Circuit Court of Appeals noted: "On summary judgment, the [*DENC II* court] found that Philadelphia improperly denied coverage and failed to reasonably explain its basis for the denial.  It thus held that Philadelphia breached the policy and violated the UDTPA, granting partial summary judgment to [the insured]."  *Id.* at 42–43.  In *DENC III*, the Fourth Circuit agreed with the *DENC II* court's analysis, reasoning as follows:

> The letter relayed Philadelphia's water-damage findings and then, in rote fashion, recited purported policy terms. It denied coverage because DENC's damage was "the result of long-term water intrusion and deteriorated wood framing."  But none of the policy provisions Philadelphia listed in the denial letter used the phrase "water intrusion."  Nor did the letter explain which of the many enumerated provisions barred coverage.  This is particularly troubling because "some of the provisions set forth in the letter were not even part of the policy; several had been deleted and superseded by policy amendments or endorsements.  Others patently [didn't] apply to the breezeway collapse at issue, such as those citing flood or steam boilers." *DENC II*, 426 F. Supp. 3d at 156.  [The insurance company] even included "the wrong provision governing collapse." *Id.*  The drafters of the denial letter conceded these errors.  The district court was right to find that [the insurance company] offered no "reasonable explanation" for denying coverage, which § 58-63-15(11)(n) requires.  Even though the letter said that no "covered collapse commenced" during the coverage period, it didn't explain (much less reasonably so) why the policy's operative Collapse Endorsement didn't cover the loss.

> Instead, it left DENC to decipher a morass of largely inapplicable policy language with no clear connection to [the insurance company's] factual investigation.

*Id.* at 50–51 (citations omitted). Accordingly, the Fourth Circuit "affirm[ed] the district court's finding that [the insurance company's] conduct violated § 58-63-15(11)(n)—and thus the UDTPA—by failing to reasonably explain 'the basis in the insurance policy in relation to the facts' for its denial." *Id.* at 52.

As with the insurance company in *DENC*, State Farm's denial letter failed to adequately connect the insurance policy to the facts of its investigation. N.C. Gen. Stat. § 58-63-15(11)(n). Instead, State Farm left Defendant "to decipher a morass of largely inapplicable policy language with no clear connection to [its] factual investigation." *DENC III,* 32 F.4th at 51. State Farm's denial letter to Defendant first noted what her policy covered, as well as an exclusion: "Your policy provides coverage for direct physical losses; however, the policy excludes damage involving collapse and materials used in repair, construction, renovation or remodeling."

After quoting the policy information, State Farm concluded: "Since the damage sustained falls within this exclusionary language, we regret we can make no payment as a result of this loss." State Farm provided no factual basis as to why it was denying Defendant's claim, and it included several insurance provisions that Defendant was left to decipher. *See id.* In fact, Ms. Sanders conceded that the letter included several exclusions that were not the basis for denying Defendant coverage.

Moreover, the depositions of Ms. Sanders and Ms. Davis demonstrate that the

coverage letter fails to identify the reason for denying coverage. During Ms. Davis's deposition, she was asked to review the denial letter that Ms. Sanders drafted. Ms. Davis was directly asked whether the letter explained whether coverage was granted to Defendant, and if not, why:

> Q  Yeah, just from this letter, can you tell me whether or not coverage was granted to Ms. Simpson?
>
> A  No.
>
> Q  Can you explain why there was no coverage in this case?
>
> A  No, I can't.

Even though Ms. Davis was an assigned claim adjuster for Defendant's matter, she could not explain the reason behind Ms. Sanders's denial without first consulting State Farm's internal claim file—a file not included within the denial letter or available to Defendant:

> Q  Ms. Davis, if I had called you in your capacity as it's listed on this letter in 2021, 2022, and asked you why it was denied, and you indicated to me that it was this section of the coverage that was being applied to determine that "no coverage" existed. And my question to you would've been what information is linking that policy to this claim? And my question was, would you be able to make that determination or answer my question based on this letter, or would you have to seek outside help or look in the claim file, or go somewhere else for that information?
>
> A  No. I -- I don't know. I'm not -- I don't know 'cause -- I don't know.
>
> Q  Okay. In the event that you did have to look at the claim file, like you mentioned earlier, where might you have looked? What do you mean by claim file? Can you elaborate

a bit?

A  So the claim history is what I would need to go through, 'cause, gain, I did not have any handling on these claims. I -- so I don't know. I would need to go through the notes to see if it was something additional; if you're asking me additional questions.

Further, Ms. Sanders—the drafter of the denial letter—could not provide a concrete explanation of why coverage was denied when asked during her deposition. In fact, Ms. Sanders stated that she denied Defendant's claim based on a different exclusion than what was described in the denial letter:

Q. Okay. So my question is: When you say, "Since the damage sustained falls within this exclusionary language, we regret we can make no payment as a result of this loss," which of those two sections that contain exclusionary language are you applying to deny coverage?

MR. SCOTT LEWIS: Objection. Asked and answered. You can go on, Adrienne. Answer it.

A. Well, I'll just answer it again. The – I'm applying coverage and the -- the damage sustained, based on my investigation, did not meet the definition of "collapse." And so I, again, put in Section 1 - Exclusions to address everything that was brought to my attention.

Q. And I agree that you've answered questions that result in that answer. My question's more specific. It has do with where you say in the end here that, "Since the damage sustained falls within this exclusionary language," what exclusionary language are you talking about in that sentence?

A. For the basis of the denial, the language in Collapse, c.(1), (2), (3).

The denial letter cites Exclusions Section B(c)(3), whereas Ms. Sanders testified that

Defendant's claim was excluded under Additional Coverages Collapse Section E(8)(c)(1)–(3).

Accordingly, the trial court correctly denied summary judgment for State Farm on Defendant's individual UDTPA counterclaim since a genuine issue of material fact remains as to how State Farm's subsection 58-63-15(11)(n) violation proximately caused Defendant's injury. *See Sunbelt Rentals,* 174 N.C. App. at 62, 620 S.E.2d at 232 ("Under the UDTPA, proximate cause is a question of fact."). We hold the trial court did not err by denying summary judgment on Defendant's individual UDTPA counterclaim against State Farm.

### 2. *RestorePro's Quantum Meruit and Unjust Enrichment Claim*

Defendant asserts the trial court erroneously granted partial summary judgment for RestorePro, on the issue of liability, with respect to RestorePro's "quantum meruit/unjust enrichment" claim. Defendant maintains that such a result "runs contrary to well-settled law" since, in theory, RestorePro could recover against Defendant under the theories of unjust enrichment and breach of contract at trial. Alternatively, Defendant argues there is a genuine issue of material fact with respect to each element of RestorePro's unjust enrichment claim.

The second enumerated conclusion in the trial court's order granted summary judgment on RestorePro's unjust enrichment claim. "*Quantum meruit* is a measure of recovery for the reasonable value of services rendered in order to prevent unjust enrichment." *Paul L. Whitfield, P.A. v. Gilchrist*, 348 N.C. 39, 42, 497 S.E.2d 412,

414 (1998). "Unjust enrichment is 'a claim in quasi contract or a contract implied in law.'" *Butler v. Butler*, 239 N.C. App. 1, 7, 768 S.E.2d 332, 336 (2015) (quoting *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988)). "A quasi contract or a contract implied in law is not a contract." *Whitfield*, 348 N.C. at 42, 497 S.E.2d at 415 (quoting *Booe*, 322 N.C. at 570, 369 S.E.2d at 556).

"The doctrine of unjust enrichment was devised by equity to exact the return of, or payment for, benefits received under circumstances where it would be unfair for the recipient to retain them without the contributor being repaid or compensated." *Browning*, 230 N.C. App. at 542, 750 S.E.2d at 559–60 (2013). However, "[m]ore must be shown than that one party voluntarily benefited another or his property." *Id.* A prima facie claim for unjust enrichment consists of five elements:

> First, one party must confer a benefit upon the other party. Second, the benefit "must not have been conferred officiously, that is it *must not be conferred by an interference in the affairs of the other party* in a manner that is not justified in the circumstances." Third, the benefit must not be gratuitous. Fourth, the benefit must be measurable. Last, "the defendant must have consciously accepted the benefit."

*Id.* at 541–42, 750 S.E.2d at 559 (citations omitted). But "the doctrine unjust enrichment . . . will not apply here where a contract exists between two parties." *Town of Forest City v. Florence Redevelopment Partners, LLC*, 292 N.C. App. 86, 97, 896 S.E.2d 653, 660 (2024)).

Here, Defendant's challenge to the trial court's grant of summary judgment on

unjust enrichment is grounded in the concern of double recovery: "should RestorePro[] prevail on its breach of contract claim at trial, it could recover against Simpson for *both* unjust enrichment and breach of contract[.]" While we largely disagree with Defendant's precise concern, this portion of the trial court's order must be reversed because it creates a logical inconsistency. The trial court granted partial summary judgment for RestorePro "for quantum meruit/unjust enrichment as to liability," leaving the question of damages outstanding for trial. Yet, the trial court also denied summary judgment on RestorePro's claim for breach of contract— allowing this claim to proceed to trial as well. As pled by RestorePro, both the claims of breach of contract and unjust enrichment concern the same subject matter—the nonpayment for services performed, asbestos testing. The scope of the Contract between RestorePro and Defendant is ripe for the factfinder. *See Paradigm Park Holdings, LLC v. Glob. Growth Holdings, Inc.*, 298 N.C. App. 64, 73, 914 S.E.2d 20, 27 (2025) (citation modified) ("The focus in the *quantum meruit* context is on whether there is an express contract on the subject matter at issue and not on whether there was a contract between the parties."); *see also Whitfield v. Gilchrist*, 348 N.C. 39, 42, 497 S.E.2d 412, 415 (1998) (citation omitted) ("Only in the absence of an express agreement of the parties will courts impose a quasi-contract or contract implied in law in order to prevent unjust enrichment."). Since the trial court had already determined a genuine issue of material fact exists as to RestorePro's breach of contract claim, it cannot grant summary judgment on RestorePro's unjust

enrichment claim—an equitable claim. *See Town of Forest City v. Florence Redevelopment Partners, LLC*, 292 N.C. App. 86, 97, 896 S.E.2d 653, 660 (2024) ("The doctrine of unjust enrichment is based on quasi-contract or contract implied in law and thus will not apply here where a contract exists between two parties."). Accordingly, we reverse the trial court's granting of summary judgment on RestorePro's unjust enrichment claim.

### 3. *Defendant's Breach of Contract Claim*

State Farm asserts the trial court erroneously denied its motion for summary judgment on Defendant's breach of contract counterclaim. Within its counterclaim, Defendant noted "[t]he conduct of State Farm . . . violates the implied covenant of good faith and fair dealing in the Policy." State Farm contends that in the insurance context, claims for breach of contract and breach of the implied covenant of good faith and fair dealing are distinct, are not dependent upon one another, and provide different remedies. State Farm asserts the trial court ruling is erroneous because Defendant "cannot prove that State Farm committed the tort of bad faith refusal to settle her claim with the requisite aggravation."

"In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Heron Bay Acquisition, LLC v. United Metal Finishing, Inc.*, 245 N.C. App. 378, 385, 781 S.E.2d 889, 894 (2016) (citation and quotation marks omitted) (quoting *Bicycle Transit Authority v. Bell*, 314 N.C. 219, 228, 333 S.E.2d 299,

305 (1985)). "Where parties have executed a written contract, an action for 'breach of the covenant of good faith and fair dealing is part and parcel of a claim for breach of contract.'" *Ballard*, 714 F. Supp. 3d at 644 (citation omitted).

Here, Defendant's responsive pleading asserted a breach of contract counterclaim against State Farm. The contract that was alleged to have been breached was the homeowner's insurance agreement between State Farm and Defendant. Defendant alleged that State Farm materially breached the insurance agreement by "failing and refusing to indemnify [her] for the damages sustained to the dwelling, contents, and loss of use." Defendant added that State Farm denied her the benefits of her homeowner's insurance policy, which she had paid and was entitled to. Within that portion of Defendant's pleading, she noted: "The conduct of State Farm as alleged . . . also violated the implied covenant of good faith and fair dealing in the Policy." State Farm contests the trial court's conclusion of law because, in Defendant's prayer for relief, Defendant requested "punitive damages against RestorePro and State Farm in an amount to be proven at trial[.]"

Our review leads us to conclude that the trial court did not err by denying State Farm's motion for summary judgment on Defendant's breach of contract counterclaim. That is, there remains a genuine issue of material fact as to whether State Farm breached their contract with Defendant, and whether State Farm's refusal to perform under the contract was "because of a legitimate, 'honest disagreement'" as to the claim's validity. *Cf. Ballard*, 714 F. Supp. 3d at 644

(citations omitted); *Goldsmith*, 359 F. Supp. 3d at 314 ("Legitimate and honest disagreement over the scope of coverage under an insurance contract does not amount to bad faith.").

Accordingly, we hold the trial court correctly denied State Farm's motion for summary judgment on Defendant's claim for breach of contract, which included an implied covenant of good faith and fair dealing since genuine issues of material fact remain to be resolved. However, to resolve any ambiguities, we vacate the following language in the order: "The Breach of Contract counterclaim includes a claim for breach of the implied covenant of good faith and fair dealing and such claim survives summary judgment as well."

## IV. Conclusion

For the above reasons, we hold the trial court did not abuse its discretion by denying Defendant's motion to compel discovery from State Farm. Moreover, we hold the trial court did not err by: granting summary judgment for RestorePro and State Farm on Defendant's joint UDTPA counterclaim; granting summary judgment for RestorePro on Defendant's individual UDTPA counterclaim; denying summary judgment on Defendant's individual UDTPA counterclaim against State Farm; and denying summary judgment for State Farm on Defendant's breach of contract counterclaim. We therefore affirm these provisions in the trial court's order. Nevertheless, we vacate a portion of the order pertaining to the implied covenant of good faith and fair dealing. Further, since we hold the trial court erred in granting

summary judgment for RestorePro on its "quantum meruit/unjust enrichment" claim, this portion of the order is reversed.


AFFIRMED IN PART; VACATED IN PART; REVERSED IN PART.

Judges STROUD and MURRY concur.

Report per Rule 30(e).